JAMES KENNEDY, Appellant, v. JOHN RYALL, Administrator, etc., Respondent.

The rule of mercantile law making the master of a vessel liable for the negligent acts of those under his authority, to the same extent as if he was the owner, applies without regard to the question whether the officers or men were employed by himself or the owners.

The authority given to the health officer of the port of New York by the statute (chap. 275, Laws of 1850) to take charge of a vessel subject to quarantine, and to control and direct, so far as necessary for quarantine purposes, the master and other employes thereon, is but temporary and specific; and the officers and men employed upon the vessel are not in any sense his agents or servants after his duties on board the vessel are performed and he has left it; it devolves upon the master to see that the vessel is restored to a proper condition for the comfort and safety of passengers.

Defendant was in command of a steamship at quarantine, which was directed to be fumigated by the deputy health officer of the port of New York; by his order, the chief steward cleared the passengers from the steerage, and utensils containing some poisonous substance were placed therein for the purpose of fumigation. The health officer gave instructions as to the length of time the steerage should remain closed, and as to the removal of the vessels; one of these, an ordinary drinking cup, was not removed with the others, and plaintiff's intestate, a child four years and nine months old, who, with his mother, had been ordered by the steward to return to the steerage cabin, drank some of the poison in the cup, and died from the effects thereof. In an action to recover damages, *held*, that it was within the line of the defendant's duty to see that the poison was removed; and for his negligence, or the negli-

gence of his subordinates, in omitting to discharge this duty, he was liable.

Also *held*, that, as the mother of the deceased had been directed to return to the cabin, she had the right to infer that every thing was safe, and that no extraordinary diligence on her part was required for the protection of her child.

At the time of the accident, plaintiff, who was the father of the child, lived, and for seven months prior thereto had lived, in New York; he came from England, and his wife and child were coming to join and live with him. *Held*, that the evidence was sufficient to show *prima facie* that he was domiciled in New York; and so that his child was an inhabitant thereof; and that the surrogate of that county properly issued letters of administration to him.

Plaintiff testified that he came to New York for the purpose of making a home and a living there. This was stricken out on motion of defendant's counsel. *Held*, error ; that the evidence was proper and material on the question of residence.

(Argued November 17, 1876; decided November 28, 1876.)

APPEAL from order of the General Term of the Superior Court of the city of New York reversing a judgment in favor of defendant, entered upon an order dismissing plaintiff's complaint on trial, and granting a new trial.

This action was brought to recover damages for the alleged negligence of defendant, causing the death of plaintiff's intestate.

The plaintiff left London, England, in July, 1870, and since the twenty-seventh of that month has resided in the city of New York. On the 2d of March, 1871, his wife and his two children, one being the deceased, an infant four years and nine months old, sailed in the steamship "City of Brussels," commanded by the defendant, to join him. Upon the twelfth of March the ship arrived in the port of New York, and having small-pox on board, went to the quarantine anchorage, opposite the quarantine station on Staten Island. The deputy health officer came on board, and, under his directions, the chief steward cleared the steerage of all the passengers, ordering them on deck, and the health officer then fumigated the ship. The material used for this purpose was a deadly poison, and was distributed around the cabins in basins and in the passengers' pannikins, which are their drinking cups. The

health officers, closing the cabins and leaving instructions as to the length of time they should be kept closed, and as to the removal of the vessels, left the ship and went on shore. In about one hour after, the head steward of the ship ordered the plaintiff's wife and children down into the cabin, where, after remaining about half an hour, the deceased came running and crying to her with a pannikin in his hands, with his tongue protruding from his mouth, thick and white, having drank the contents of the pannikin, which turned out to be some poison that had been used to fumigate the ship. The child died in about three hours after.

Letters of administration were granted on the infant's estate, by the surrogate of New York county, to the plaintiff.

The defendant was not in any way interested in the steamship, as owner or otherwise than as the captain.

Upon the trial, plaintiff testified that he came to New York for the purpose of making it his home and living here. This was stricken out on motion of defendant's counsel.

At the close of the evidence, a motion was made to dismiss the complaint, which was granted.

*James W. Gerard* for the appellant. No such residence or habitation was shown on the part of the father as would give the surrogate of the county of New York jurisdiction. (3 R. S. [Banks' 6th ed.], 76, § [23] 24; id., 167, § 4; *People* v. *Corlies*, 1 Sandf., 228; *People* v. *Barnes*, 12 Wend., 492; *Corwin* v. *Merritt*, 3 Barb., 341; *Paff* v. *Kinney*, 1 Bradf., 1; *Sheldon* v. *Wright*, 5 N. Y., 497; *Guier* v. *O'Danniel*, 1 Bin. [Penn.], 349; *Munro* v. *Munro*, 7 C. & F., 842; *Dupuy* v. *Wurtz*, 53 N. Y., 556; Phillmore's Law of Domicile, §§ 173–176, 186, 187.) It was proper to raise this question on the trial of this action. (*Dutchess of Kingston's Case*, 2 S. L. Cas., 689; *Bolton* v. *Jacks*, 6 Robt., 166; *Kentz* v. *McNeil*, 1 Den., 436; 3 Redf. on Wills, 58, § 5.) Defendant, as captain of the vessel, was not liable. (Dunlap's Paley's Agency, chap. 6, § 2, p. 402; *City of Buffalo* v. *Holloway*, 7 N. Y., 493; Smith's Master and Servant, 75 Law Lib., 151,

152; *Kelly* v. *Mayor, etc.*, 11 N. Y., 432; *Blake* v. *Ferris*, 5 id., 48; *Maximilian* v. *Mayor, etc.*, 62 id., 160, 163; *Nicholson* v. *Mounsey*, 15 East, 382; *Blakie* v. *Stembridge*, 6 C. B., 893; Laws of 1850; chap. 275.) The deceased and its mother were guilty of contributory negligence. (Redf. on Car., § 528; *Wilcox* v. *R., W. and O. Railroad Co.*, 39 N. Y., 358; *Mangan* v. *Brooklyn City Railroad Co.*, 36 Barb., 237; *Burke* v. *Broadway, etc., Railroad Co.*, 44 id., 529; *Flynn* v. *Hatton*, 4 Daly, 552; Wharton on Neg., § 311.)

*Rufus B. Cowing* for the respondent. The master of a ship is personally liable to third persons for damages happening by reason of the negligence of himself or his mariners. (Serg. & R. on Neg., 131, § 113; *Denison* v. *Seymour*, 9 Wend., 1; *Schieffelin* v. *Harvey*, 6 Johns. 169; *Foot* v. *Wiswall*, 14 id., 303; *Watkinson* v. *Langton*, 8 id., 213; Abb. on Shipping, 231, notes on pp. 231, 232; id., 173, note 1; Story on Agency [8th ed.], §§ 314–319 and notes.) The surrogate had jurisdiction. (Story on Conflict of Laws, § 46; *Sprague* v. *Litherbury*, 4 McL., 442; 3 Ohio, 101; 4 Greenl., 47.) Plaintiff was entitled to have the issues, as to negligence, submitted to the jury. (*Wolfkiel* v. *Seventh Ave. Railroad Co.*, 38 N. Y., 49; No. 11 N. Y. W. Dig., 225; *Berhart* v. *R. and S. Railroad Co.*, 32 Barb., 165; *Williams* v. *O'Keefe*, 24 How., 116.) The deceased and his mother were free from negligence. (*Cook* v. *N. Y. C. Railroad Co.*, 42 N. Y., 476; 38 id., 49.)

MILLER J. The question how far a master of a vessel is answerable for damages arising by reason of the negligence of those employed under him, lies at the foundation of this action.

The testimony upon the trial establishes that the steamship of which the defendant was in command was fumigated under the directions of the deputy health officer of the port of New York, who, by statute, has full authority for that purpose. By his order it devolved upon the chief steward to clear the

passengers from the steerage and keep them away from the effect of the dangerous substance employed. The utensils, which consisted of pans and pannikins in which to pour the poisonous materials, were also furnished by the steward. After closing the steerages and leaving instructions as to the length of time they should be kept closed and as to the removal of the vessels containing the poison, the steamship was left by the deputy health officer and his men, the chief steward having been cautioned in regard to the poison. In about one hour afterwards the steward ordered the plaintiff's wife and children down in the cabin, and in about half an hour after this the poison was taken, by the deceased, from a pannikin, which had not been removed with the other utensils, which was seen by the child's mother on a seat by the dining table in the steerage, where the child was playing, and from the effects of the poison, the child, soon after it was taken, died. Although the health officer has power, under the laws of the State, to take charge of the vessel for the purposes indicated in the statute, and the master and other employes are subject to his control and direction in reference to the subject, so far as the object to be accomplished is concerned, that officer occupies no such position as confers upon him superior authority, so as to render the officers and employes on the vessel his servants and agents after he had left the same. The duties of the health officer are but temporary and specific, being confined entirely to the cleansing of the vessel. In carrying out this purpose he may direct the master and other officers as to details and secure their aid; but it surely is not required of him to remain and see that the utensils employed are cared for and the cabin placed in proper condition for the accommodation, comfort and safety of the passengers. When the deputy health officer and his men had furnished the proper materials, distributed the pans and pannikins around the steerage and given the proper instructions their business was at an end, and it devolved upon the captain or such officer as might be assigned by him for that purpose, to attend to the removal of the vessels used and to the resto-

ration of the ship to a suitable condition. After the fumigation was completed, it was his right, and clearly within the line of his duty, to see that the materials employed were not left in an exposed position, where they might be productive of injury or serious and fatal results to any of the passengers. The chief steward having furnished the utensils which contained the poison used in the fumigation, given directions to the passengers to leave the steerage, received instructions in regard to the same and directed the mother and child when to return, it would seem to follow, unless other orders were given, that it was also a part of his business to free the cabin from all dangerous materials. In this respect he was in no sense the agent of the deputy health officer, and was not delegated to perform any part of his duty. So far as he attended to the removal of the poison and the reinstatement of the steerage, he was apparently acting within the general scope of his duties. Although not directly proved that this duty especially belonged to him, it may be assumed from the fact that he did perform it in the absence of any other directions from the master, that it was his work, and that it was performed with the approval of his superior officer. He was, then, to all intents and purposes, the servant of the master, acting for him and on his behalf. That officer was in command of the vessel, and it was under his control and subject to his general management and direction — at least until the completion of the voyage, and it was safely in port. By a rule peculiar to the *mercantile* law, the master is liable for the negligent acts of an employe, while engaged under his authority, to the same extent as if he were the ultimate principal, who is ordinarily bound to respond in damages for such negligence. (Shear. & Redfield on Neg., § 113.)

In *Denison* v. *Seymour* (9 Wend., 1) an action was brought for an injury occasioned by the negligence of an employe, acting as the pilot of a vessel, and it was held that the master was liable. And this rule applies without any distinction whether the officers and men were appointed by the owners or himself. (Story on Agency, § 316; see also, *Schieffelin* v.

*Harvey*, 6 J. R., 169; *Foot* v. *Wiswall*, 14 id., 306; *Watkinson*
v. *Laughton*, 8 id., 213.) From the authorities cited it is mani-
fest that the ground upon which the rule of *respondeat supe-
rior* is based, viz., the right which the employer has to select
his servants and to discharge them, has no application to a
case which involves the relations between a master of a vessel
and the employes upon the same. It follows that the defend-
ant was liable if the chief steward was negligent in not
removing the pannikin which was the cause of the death of
the intestate. It appears that he left the pannikin, which
was an ordinary drinking cup, which might well attract the
attention of a child of tender years, and which might very
naturally be taken up to drink from ; and being well
acquainted with the nature of the poison it was the plain
duty of the steward to guard with extreme care against the
danger of such an accident. The evidence establishes that he
knew that pannikins had been used in the fumigation, and
it is but reasonable to require that he should have taken pains
to find and remove them. Having failed to exercise the vigi-
lance and care which was essential for that purpose, it was a
fair question for the jury to determine whether his omission
was negligence.

There is no valid ground for claiming that the child or
its mother was chargeable with negligence which contributed
to produce the injury. The mother was present in the cabin
with the child within her sight and hearing, and appears to
have given him all the care and attention which was required
for his protection and well-being. She had no knowledge of
the existence of the cup containing the poison, and no reason
to apprehend that any danger was at hand in consequence
of the fumigation. As she had been directed to go into the
cabin she had a right to infer that every thing was safe there,
and that no extraordinary degree of vigilance was required
for the protection of her child. Under the circumstances,
there is no valid ground for claiming, that contributory negli-
gence was established.

It is insisted by the defendant's counsel, that the plaintiff

cannot maintain this action in a representative capacity, for the reason that the surrogate of New York had no power to issue letters of administration. Assuming that this point can be raised collaterally in this action, the soundness of the objection urged depends upon the question whether the plaintiff's intestate was an inhabitant of the city and county of New York. At the time of the death of the child and for seven months prior thereto, his father, the plaintiff, was living there. He had previously resided in England, and his wife and the child came to join him and to live with him in New York. He testified that he came there for the purpose of making a home and a living. This evidence was erroneously stricken out, and as it was material upon the question of residence, and as the action can be maintained as already shown, this error would entitle the plaintiff to a new trial. But without regard to this testimony, and independent of it, the evidence upon the trial tends to show, that his domicile was in New York. He had left or emigrated from his own country, located, and was at work in New York, thus showing an intention to establish a residence there, and so far as the evidence goes, evinced no intention or determination to reside anywhere else. Here was a *prima facie* evidence that he was domiciled there, and it was for those who claim otherwise to rebut this evidence. (*Marsh* v. *Hutchinson*, 2 B. & P., 231, note ; *Heidenbach* v. *Schland*, 10 How. Pr. Rep., 477.)

If he had not a domicile in New York, it would be difficult to say how a domicile could be proved where a person who had left his own country had thus settled. Generally speaking domicile and residence mean the same thing. And an *inhabitant* is defined to be one who has his domicile in a place or a fixed residence there. (*Crawford* v. *Wilson*, 4 Barb., 520.) The domicile of an infant necessarily is the same as that of his father (Story on Conflict of Laws, § 46.) The intestate was under the control of his parents, traveling with his mother to join his father at the home of the latter and of the family, and in law was actually residing in the city of

New York. Both the father and son were inhabitants of that city, and the residence of the deceased being there the surrogate had ample authority to issue letters of administration which authorized the plaintiff to institute this action.

The General Term were right in their decision, and the order must be affirmed, and judgment absolute ordered for the plaintiff.

All concur except RAPALLO and EARL, JJ., not voting.

Order affirmed and judgment accordingly.