New York County.—HON. D. C. CALVIN, Surrogate.—
April, 1880.

### Von Hoffman *v.* Ward.

*In the matter of the probate of the will of* Samuel
Ward, Jr., *deceased.*

For the purpose of succession, every person must have a domicil, and but one; and the domicil of *origin* will be presumed to continue until a

new one is acquired. To effect a change for such purpose there must not only be a change of residence, but an intention to abandon the former domicil and acquire another as a *sole* domicil.

The rule that an infant's domicil is that of his father is not overcome by the mere separation of the parents (there being no legal dissolution of the marriage), and the departure of the mother with the infant from the country in which the father resides.

In 1857, while decedent was a minor, his parents separated, and the mother went abroad with decedent for economy of living and to educate her son. They sojourned at different places in Europe, the mother sometimes living apart from her son while he was away at school. The mother derived her income from a house and lot in the city of New York, which had been settled on her by her husband. The mother stated to her brother-in-law, a banker of New York, during several visits made by him to Europe, that she intended to send her son, when he was properly educated, to him, to enter and continue in his employ; and in a letter addressed by the mother to her brother-in-law, written shortly before her death, she bequeathed her son to him, stating that she left him without support, to his guidance and protection. The son at the time of his death was above twenty-one years old. The father continued to reside in the State of New York. *Held*, that the evidence did not establish an intention on the part of decedent to adopt a foreign domicil.

Where the testator, after reading the will, states in the presence of the witnesses, "evidently I give all I possess to my mother," and the attestation clause, which recites that the testator declared to the witnesses that it was his testament and the expression of his last wishes, is read to and by the testator, and he requests the witnesses to sign as such, *Held*, to be a sufficient publication of the will.

APPLICATION for the probate of an instrument propounded as the will of Samuel Ward, Jr. The probate thereof was contested by the father of decedent, Samuel Ward.

A citation directed to said Samuel Ward was issued on the petition of Louis A. Von Hoffman, which set forth that the decedent, whose domicil was in the city of New York, but who, at the time of his death, was sojourning in the empire of France, died at the city of Paris, on or about the 19th day of September, 1866; that on or about said date he there duly made, executed and

published, in accordance with the testamentary laws of the state of New York, and left unrevoked, and in force at his death, his last will and testament in writing, relating to his personal estate, and disposing of the whole thereof to his mother, Medora Ward, and that no executor was named in said will.

That, on the 27th day of May, 1867, the said Medora Ward died, leaving a last will and testament, bearing date March 5, 1867, whereby she gave, devised and bequeathed all her property and estate whatsoever, including her right to, and interest in the aforesaid bequest, made to her by Samuel Ward, Jr., unto the petitioner as trustee, upon the trusts declared therein, which will was duly admitted to probate in this court, on the 8th day of January, 1869; and that no executor being named in the will, letters of administration with the will annexed were, on the 21st day of June, 1870, duly issued to the petitioner, the residuary legatee named in said will, who is still such administrator; and that the right to and interest in the personal estate of said Samuel Ward, Jr., bequeathed by his will aforesaid, is now vested in the petitioner.

That Samuel Ward, of the city of Washington, the father of the decedent herein, was and is his only next of kin, and that decedent was never married; that decedent left assets in this county which are still here (and left no assets elsewhere in this state), of the value of not to exceed $10,000. That petitioner is informed and believes that the Surrogate of this county has jurisdiction to take proof of decedent's will, and to grant letters of administration with the will annexed thereon; that petitioner is desirous that such proof should be taken,

and such letters granted to him, and prays that a citation may issue, directed to the proper persons, requiring them to attend the probate of said will and testament, and that such further and other proceedings may be had as shall be requisite to the proving and record of said will, and the granting of such letters thereon.

Samuel Ward appeared and opposed the probate of the will.

The proponents offered in evidence the testimony of Susetta Grymes, taken on commission at Paris, France, which testimony was in substance as follows :

I am upward of 76 years of age. I reside in Nice. In the month of September, 1866, I resided in Paris. Samuel Ward, Jr., was my grandson and died in my arms on the 19th of September, 1866, in the city of Paris. I knew him from his birth. The paper writing herein being shown her, she testified : I recognize this as the veritable last will and testament of my said grandson. I was present at its execution ; it was executed in his own room. The name of Susetta Grymes is my own name, and was written by me as a witness to it. *Decedent signed it in my presence, and in the presence of the other witnesses, himself, in his room in Paris, on September* 19, 1866. It was written in my presence, and in the presence of the other witnesses, Mr. Schauss, Mr. E. Moreau and Dominique Jourdan. At the time he signed it, the only thing decedent said in relation to it was, " Evidently *I give all that I possess to my mother ; I do not know my father.*" Witness further testified *that the will was read before us all and thereupon decedent said,* " Send this to Mr. Von Hoffman," and I did so. Decedent said to me " *Have you the witnesses,*"

I said, yes, "here they are." I called the three witnesses and I signed with them. The said witnesses signed the paper in my presence, and in the presence of decedent, upon the desk in his room. I said "here are the witnesses." He said, "*Let them sign*," and they signed in his presence. There were only five persons in the room, decedent, myself and the three other witnesses. He was then of sound mind, memory and understanding, and not under any restraint. He was sitting up in his bed, suffering from oppression in breathing. He was above twenty-one years of age. His conversation with me, and with his doctor, clearly proved the soundness of his mind and of his memory. When the doctor arrived, and said, "Your legs look very bloodless," he replied, "Not more so than my face." His mother sent him a little medal which had been blessed at Marseilles, and very naturally, as a Roman Catholic, he said "Tell my mother not to be uneasy, the medal will do me good."

Two hours before he died, he said: "Ah, my grandmother, I feel that I am about to die, for I am suffocating," and asked for a confessor. He made his confession, and received the sacrament of communion. Upon cross-examination, she testified that decedent was the son of her daughter, Mrs. Medora Ward; and, further, I was residing with him and his mother at the time of his death. Prior to that, for fourteen months, he had been in a banking-house of Mr. Pascoe, at Marseilles. We left the United States together, and came to France in 1857. Decedent staid with me, with a tutor, in various lodging-houses, at Nice, for eight years. During this period his mother was always with him. He died at eleven o'clock on the night of September 19, 1866; the

will was signed by him at nine o'clock in the morning of the same day. The body of the instrument and of the attestation is in the handwriting of my friend, Mr. Destrieux. The will was written by him in the dining-room. He brought it to decedent, *who having read it over,* signed it in my presence, and in the presence of the three other witnesses. The attestation clause was also written there in my presence. I do not know that any other persons were present, except my chambermaid, Dominique Jourdan.

My daughter, Mrs. Medora Ward, at the time of decedent's death, was lying sick in her bed. His death was concealed from her four hours. She died in the month of May, 1867, in the city of Paris, of heart disease. Decedent was of a delicate constitution, but his last illness was pleurisy, which continued two days and a half. . . .

I took charge of the last will and testament, immediately after it was signed. It was put in my portfolio, which was put in my bureau. It remained there about a week, when I sent it to Mr. Von Hoffman.

I did not know I am the first witness examined under this commission. I had not been told what such testimony was, or any portion thereof.

Proponent's counsel then read in evidence the paper offered as the will of the decedent, in the following words:

Je soussigné Samuel Ward, en ma pleine présence d' ésprit déclare par les présents léguer toute ma fortune personnelle à ma mère Medora Ward.

Paris, le 19 Septembre, 1866.

SAMUEL WARD, Jr.

L'acte ci dessus nous a, au lieu et à la date y désignés, été déclaré par Monsieur Samuel Ward le testateur, être son testament l'expression de ses dernières volontés, en foi de quoi il y a apposé sa signature en notre présence. Sur sa requête nous avons signé le présent document en qualité de témoins.

Paris, le 19 Septembre, 1866.

Témoin, T. MOREAU,.               F. SCHAUSS,
    Rue Mondovi 4, Paris.     Place de la Madeleine
                                                       N. 33.

Témoin, SUZETTE GRYMES, en ce moment à Paris, Nice, Promenade des Anglais No. 9 demeure.

Témoin, DOMINIQUE JOURDAN, 33 Place de la Madeleine, 96 Paris.


Which being translated is :


I, the undersigned Samuel Ward, being in my full presence of mind, declare by these presents to bequeath all my personal property to my mother, Medora Ward.

Paris, September 19th, 1866.

SAMUEL WARD, JR.

The above instrument was, at the place and time therein designated, declared to us by Mr. Samuel Ward, the testator, to be his testament, and the expression of his last wishes, in witness whereof he affixed his signature in our presence.   At his request we have signed the present document as witnesses.

Paris, September 19th, 1866.

Witness, T. MOREAU,               F. SCHAUSS,
    Mondovi Street 4, Paris.   Place of the Madeleine,
                                                       No. 33.

Witness, SUZETTE GRYMES, at present at Paris, residence at Nice, Promenade des Anglais, No. 9.

Witness, DOMINIQUE JOURDAN, 96 Paris, 33 Place of the Madeleine.

Louis A. Von Hoffman, on behalf of proponent, testified :

I am the executor named in one of the wills of Medora Ward. I married her sister, and was well acquainted with her and decedent. They went to Europe in the spring of 1857, decedent being then about thirteen years of age, and did not return to this country. From that time down to his death, I was acquainted with their movements, not to a day, but generally. I corresponded with the mother, and with decedent during the last year of his life, probably, and there was constant correspondence between the mother and my wife. I saw them in Europe when I went there in 1857; they went a few months later than I did. I went to Europe again in 1862, and saw them, and again in May, 1867; then I saw only the mother, decedent having died the previous fall. I passed the winter of 1862–'3, with them in Italy. In the winter of 1857–'8 I saw them at Nice; for several months in the spring, they had hired a furnished apartment there. My visit with them in 1862–'3, at Pisa, Italy, covered a period of several months ; they were then established in a furnished house. In Nice decedent had a tutor. In 1863, I saw the mother alone ; he was with Professor Mersch, in Luxemburg, for his education. In 1867, Mrs. Ward was in Paris ; she had had an operation of a tumor in the fall, and was lying at

the point of death. . . . When she arrived in Europe in 1857, she spent, say about six months in touring. I met her in 1858 at Nice, in 1863 in Pisa, and in 1867 in Paris. She went with her mother to Sicily, and she passed about eight months before her death in Marseilles. She went to Paris for the purpose of having this operation performed, a few days before decedent died. She was then ill and unconscious, and only learned of his death when he was buried. She wrote me that she put her son as a clerk in a commercial house in Marseilles, to learn business, and when she was going to Paris before that operation, feeling nervous about it, she wrote me a letter, a part of it is as follows:

"MARSEILLES, *July* 11, 1866.

"I bequeath my poor Wardy to you. Be good, be indulgent to the child which I leave alone, without support, without guidance, without protection. I have trained him to consider you as his sole sustainer and sole arbiter of his destiny. One word from you will do more than all the others can say. His character may perhaps not please you. I only know too well the weak spots, but tell yourself that he is still a child, and don't become discouraged, in memory of mine, and from 'up there' I shall bless you."

She always told me, being in business here, that she hoped I would take him into my business. She told me so several times, but I can't state how often; in 1863 she spoke about it, afterwards she must have written about it. . . I recollect that I corresponded with her about him, and told her that it would be good to give him a commercial European training before she sent him back

to this country.  She wished it that he should come in my business here in New York.  She never expressed any other desire in regard, to her son—anything different from that.  When he inherited something like $16,000 or $17,000 from his uncle, he wished me to invest it in American stock, United States bonds. . . . As a young girl, Mrs. Ward traveled with her mother in Europe.  Then she married here in New York. . . Her longest residence in the United States has been in the city of New York and Staten Island.  Her husband left her, and did not provide for any of her expenses.  Her mother had to pay the debts, and her friends, Mr. Livingston and Mr. Cunard, advised her to go to Europe, because she couldn't live here ; hadn't the means to live here.  They engaged a German tutor here, I suppose six months before they left—took him over to Europe ; I had him for some time at Nice ; then the boys were sent to Luxembourg, and later decedent was put in a school at Heidelberg, when the mother was in Sicily.

On cross-examination the witness testified that the name of the uncle from whom the young man inherited this fortune was Marion Ward ; "he inherited it afterwards from old Mr. John Ward ; that was never paid over ; that is still in the hands of Mr. Butler."  I don't think that Mrs. Ward had any intention to return to this country ; she didn't tell me anything on that subject.  I can't tell what she intended to do. . . . If decedent should (have) come back, she would probably have followed him.  She was in Paris when she was ill.  From the time she left this country she was in Paris only on occasional visits, until she went there to have this operation performed, and then she staid there sev-

eral months.    I should think she lived in Marseilles less than a year.    She lived at Nice the greatest part of her stay in Europe.

Samuel Ward, the contestant, being duly sworn on his own behalf, testified :

I was the father of decedent ; he was born in July, 1844, and went to Europe in 1859 with his mother and grandmother.    They left this country for a permanent residence abroad.    Neither he or his mother, and I think his grandmother, ever returned to this country after that.    I was in correspondence with him up to 1864, wher. he left Luxembourg to go to Paris.    I settled a house in Bond street upon my wife, and that gave her an income.    When my son became of age he inherited money from my brother, left him by my request ; before that he was supported out of his mother's fund, and sometimes I sent him small remittances.    I have a letter declining to put him at Annapolis or West Point, because they would not consent to his coming to America.    He had an opportunity through friends of mine to receive an appointment in the naval academy.    I made inquiries until the March or April after his death, as to whether there was any will made by him, of Charles G. Butler, counsel for Mr. Von Hoffman.    I took out letters of administration on his estate in April, 1867, on Saturday, and on Monday Mr. Butler, representing Von Hoffman, produced two wills.

On cross-examination he testified that a younger son went abroad with decedent, and lived with him.    From that time their mother and myself exchanged letters from time to time ; between eight months and a year previous a separation occurred between my wife and my-

self. I saw them the day before they sailed, and received three or four letters a year from decedent. They went in 1857; the last letter I received was from Luxembourg, in the last half of 1864. I have no remembrance now where the letters were from prior to that; they were nomadic, in different parts of Europe; they were domiciled I think somewhere. Prior to 1864, the letters from decedent were from France and Luxembourg, from no other countries. He died in 1864, I think in May. I have no personal knowledge of their going from Luxembourg to Paris, or of their being in Paris at all. My brother, who bequeathed money to decedent, resided in New Orleans. . . . The paper shown me, being my petition for letters of administration on my son's estate, bears my signature and was sworn to by me. The paper was then offered in evidence and states that witness is the father of decedent, who died at Paris, France, on September 20, 1866, and that at or immediately previous to his death he was an inhabitant of the county of New York.

On re-direct examination the witness testified: I have no idea where this petition was filled up; I suspect in this office. My attention was not particularly called to the printed words that he was an inhabitant of the State of New York, &c. I did not look at these things much. I came up in a hurry and signed them in a hurry.

I saw decedent in Heidelberg in December, 1859. He was a student in an institute there. He went with me to Dresden, spent a fortnight there, and went back to Heidelberg. When I first went abroad his mother was living at Nice, France. I did not go to Nice, did not see my wife, did not receive any letter from her there, from

any part of Europe ; had no interview with her. Decedent spoke the French language perfectly. I do not know of his having any friends in this country to whom he wrote. He was too young to form acquaintances before he went away.

On re-cross examination, the witness testified decedent was a little rusty in his English, when he had been abroad so. long. I went to Heidelberg.knowing he was there, from a letter from his brother ; he was living in Mr. Hoffman's school. I told Mr. Hoffman I was going to Dresden, and would like to take him along and give him a little Christmas frolic.

This was the last personal interview I had with decedent ; I had no other from the time of his sailing from the United States in 1857. This was a little more than two years after.

The contestant further offered in evidence the testimony of Jules J. Worms, the doctor who attended decedent in. his last illness, taken by commission. His evidence did not bear materially upon the issue involved in this contest.

Joseph H. Choate, *for proponent.*

Wm. D. Hennen, *for contestant.*

The Surrogate.—The testimony shows that the decedent was above twenty-one years of age when he executed the instrument propounded, and died. That in 1857, the decedent's mother, for some domestic reason not disclosed, separated from her husband, who still resides in this city, and that she, with her infant son and her mother, and after she had received a conveyance

from her husband of a house and lot in this city, from which she derived her support, went to Europe for economy of living, and to educate her son. That they sojourned at different places in Europe, the mother sometimes living apart from her son, who was away at school, and that she from time to time corresponded with her brother-in-law, Mr. Von Hoffman, a resident in this city. Mr. Von Hoffman visited Europe several times and saw the mother, upon which occasions she uniformly spoke of sending her son, when he was properly educated, to Mr. Von Hoffman, with the intention of his entering and continuing in his employ. A short time before the death of the mother, which occurred a few days after that of her son, she wrote to Mr. Von Hoffman under date of July 11, 1866, that she bequeathed her son to him, and invoked his kind interest in him, stating that she left him without support, to his guidance and protection.

The decedent's father testified, that his wife, her mother, and the decedent, when they went to Europe, went there with the intention of permanently residing there. But it also appears, that after decedent's demise, and before it was discovered that he had left a will, the father petitioned for letters of administration to the Surrogate of this county, which petition alleged that decedent, at his death, was an inhabitant of the state of New York. But he also testified that his attention was not called to that statement in the petition.

In Graham *v.* Public Administrator (4 *Bradf.*, 127) it was held that a domicil could be acquired only by residence with the intention of remaining at the new place of abode, and that intention alone was not sufficient, and

that for the purpose of succession every person must have a domicil somewhere; and that the domicil of origin was not lost until a new one was acquired. In the Matter of Thompson (1 *Wend.*, 43), the court adopted the definition of domicil by Vattel, as a fixed habitation in a place with an intention of always staying there. In Kennedy *v.* Ryall (67 *N. Y.*, 379), it was said, at page 386, that, generally speaking, domicil and residence mean the same thing, and that an inhabitant is defined to be one who has his domicil in a place or a fixed residence there; and that the domicil of an infant necessarily is the same as that of his father. In Dupuy *v.* Wurtz (53 *N. Y.*, 556), the question of domicil is very fully discussed, with an elaborate discussion of the authorities upon the subject. In the case it was held that the domicil of origin would be presumed to continue until a new one should be acquired, and that, to effect a change of such purpose, there must be not only a change of residence, but an intention to abandon the former domicil. The facts in that case were as follows: The testatrix, resident of and domiciled in New York, went abroad with her husband in 1859, on account of her health, and spent a winter at Nice, occupying rooms at a hotel, and hired a room here to store her property by the year, spending her summers in traveling. She made her will at Nice in 1868, executed in accordance with the laws of this state, but not according to the requirements of the French law. Up to that time she kept her house in New York city unoccupied, intending and expecting to return as soon as her health would permit. But at that time she began to abandon the hope of restored health and of a return, still claiming, however, in her letters and in her will,

her residence in New York.   Afterwards she rented her house in New York, retaining one room to store some of her effects, and declared, in letters and orally, that she did not expect to return to her home in New York.   In other respects she intended to live as before.   She retained ·her investments in this state, and made none abroad.   It was held, after full consideration, that the evidence failed to establish an intention to adopt a foreign domicil, and it not appearing that the testatrix had acquired a new domicil, as respects her succession, she did not lose, by her relinquishment of her plan of return, her domicil in New York, and that the will was valid.   That case, as it seems to me, must be held to control this, as it seems to be a stronger case, in favor of a foreign domicil.

The fact of the continued residence of decedent's father in this country, and the general rule that an infant's domicil is that of his father, seems not to have been overcome by the mere separation of the father and mother, there being no legal dissolution of the relation of husband and wife.   And, it is clear, that until the decedent became of age, he had no power to establish a domicil for himself.   Moreover, the proof is abundant that it was not the intention of the mother to change his domicil, even if she had the authority to make such change.

The next and only question for consideration is, whether the instrument propounded was executed conformably to the requirement of our statute, as all the authorities seem to concur in the doctrine that the execution of a will of personal property depends upon the law of the domicil of the decedent, for its validity.

The substance of the testimony upon the subject of execution is as follows : [The Surrogate here states the substance of Mrs. Grymes' testimony and then continues :] —The attestation clause states, in substance, that decedent declared to the witnesses that it was his testament, an expression of his wishes, and that the witnesses affixed their signatures at decedent's request, and that he affixed his signature in their presence, and it purports to be subscribed by four witnesses.

In Remsen v. Brinkerhoff (26 *Wend.*, 325) it was held, that where the attestation clause subscribed by the witnesses stated that the testator declared the instrument to be his last will and testament, the mere failure to recollect by the witnesses such a declaration, or other indication that the instrument was his will, would not be evidence, *per se*, of a non-compliance with the requirements of the statute, and that in such a case, to prevent it from having the effect of a will, there must be affirmative proof of the want of publication. In Burk's Will (2 *Redf.*, 239), on an examination of the authorities it was held that publication on the part of the testator need not be in express words, but that it was sufficiently shown by evidence, that in the hearing of both witnesses, a testatrix asked the witnesses to draw her will, and after hearing it read, approved and signed it. In Coffin v. Coffin (23 *N. Y.*, 9), it was held that, where one of the witnesses, in the presence and hearing of the other, whose attendance had been procured by the testator, asked the testator, "Do you request me to sign this as your will as a witness," and testator said yes, this was sufficient as a request to both of the witnesses, and a publication of the will. In Thompson *v.*

Stevens (62 *N. Y.*, 634), it appeared that the will was drawn at the request of the testator, by one of the witnesses, under his instructions, and decedent went out for one of the witnesses. The will was read to decedent by the draughtsman in the presence of that witness, when decedent took it, and read it and said it was " all right ;" that they went to an adjoining room, where the other witness was, who read the will aloud, and the testator pronounced it correct ; it was then signed in the presence of all, and handed to the witness who drew it, with a request to witness it ; the testator then asked the witness that was brought in to do so, and the other witness was told in the presence of decedent that he was needed as a witness. It was held that the evidence showed sufficient declaration and request, and a substantial compliance with the statute. In Gilbert *v.* Knox (52 *N. Y.*, 125), the attestation clause, subscribed by the witnesses, was a full one. The witness testified that he was present at the execution, and that the testator signed in the presence of the witnesses ; and the witness stated to the decedent that it was necessary that he should request the witnesses to sign his will, as such, and stated that that was decedent's will, that he wished them to sign as witnesses ; that this occurred after the signing, and before the witness subscribed, in the presence of the witness and decedent, but that the decedent made no reply, made no inquiry, but that he had no doubt the decedent heard what he said. The court held that this showed the intention of the testator to make a valid execution of the will, and reversed the decree of the Surrogate, refusing probate, and directed the Surrogate to admit it. (See also Peck *v.* Cary, 27 *N. Y.*, 9.)

In Remsen v. Brinkerhoff (*supra*), Judge NELSON, in speaking of the declaration required by the statute, said: "Any communication of this idea, or to this effect, will meet the object of the statute." And in the same case (8 *Paige*, 496), the Chancellor said: "I think, therefore, there can be no reasonable doubt that if this will and this attestation clause, or this attestation clause alone, had been read over, in the presence and hearing of the testatrix, so that the witness should be fully satisfied that she knew and understood its meaning, a request to them to attest it as witnesses would have been such a recognition of the instrument as her will as to make a good execution thereof, according to the intent and spirit of the statute."

I entertain no doubt that the proof, in this case, establishes a sufficient publication of the instrument in question. The attestation clause, which was read to and by the decedent, states that it is decedent's will. His declaration, that he gives all to his mother, indicates not only that he clearly understood that he was disposing of his property by will, but that he so informed the subscribing witnesses, who witnessed the same.

The will should be admitted to probate.

Ordered accordingly.