## UNITED STATES v. CHONG SAM.

*(District Court, E. D. Michigan. November, 1891.)*

**1. CHINESE EXCLUSION ACT—UNLAWFUL ENTRY—APPEAL FROM COMMISSIONER'S DECISION.**

Act Cong. Sept. 13, 1888, amending the acts excluding Chinese laborers, (22 St. 58, and 23 St. 115,) provides, in section 1, that after the date of the exchange of ratifications of the "pending treaty" between the United States and the emperor of China it shall be unlawful for "any Chinese person" to enter the United States, "except as hereinafter provided;" and sections 2 and 4 except Chinese officials, teachers, students, merchants, and travelers for pleasure or curiosity. Sections 5, 6, and 7 provide that "on and after the passage of this act certain new conditions shall be imposed upon returning Chinese laborers," and restrict the classes of those who shall be entitled to return at all. Section 13 provides that any Chinese person convicted before a United States commissioner of being unlawfully in this country may appeal to the district court. *Held* that, while the restrictions of sections 1, 2, and 4 were postponed until the treaty should be ratified, the other provisions went into effect immediately, and hence the right of appeal now exists, although ratifications have not been exchanged.

**2. SAME—WHERE TO BE RETURNED—"COUNTRY WHENCE HE CAME"—DOMICILE.**

The original act of 1882 provides, in section 12, that any Chinese person convicted of unlawfully being in the United States shall be removed to the "country whence he came," and the same expression is used in all the amendments. Section 15 of the amendment of 1884, as well as section 1 of the act of September 13, 1888, declares that the provisions of this act shall apply to all "subjects" of China, and Chinese "whether subjects of China or any other foreign power." *Held*, that the latter expressions do not qualify the former, so as to require a convicted Chinaman to be returned to the country of which he is a "subject;" and one who acquired a domicile in Canada before coming into the United States must be returned to that country, and not to China.

**3. SAME—EVIDENCE OF DOMICILE.**

That a Chinaman carried on a laundry at a town in Canada for four months, that he had been in the same province for a considerable period before that, and that he possessed a return certificate, issued by the Canadian officials at Vancouver, is sufficient to show that he acquired a domicile in Canada, when there is nothing to show that he left China with the ulterior purpose of coming to the United States, except the fact that he had recently made attempts to enter.

**4. SAME—ABANDONMENT OF DOMICILE—EVIDENCE—CERTIFICATE OF RETURN.**

That a Chinese person who has acquired a domicile in Canada, and who is convicted of having recently entered the United States contrary to law, possesses a certificate of leave to return to Canada, is sufficient evidence of intention to return there to show *prima facie* that he has not lost his domicile.

At Law.

The appellant was arrested at Port Huron, July 9, 1891, while attempting to enter the United States, and brought before United States Commissioner Harris, who found that he was unlawfully in the United States, and ordered that he be removed to China. Appellant was remanded to jail to await deportation, and within 10 days from his conviction took this appeal to the judge of this court, under the provisions of section 13 of the act of congress of September 13, 1888, entitled "An act to prohibit the coming of Chinese laborers into the United States." The commissioner made no return of the testimony taken before him, but simply transmitted his finding with the order for the removal of appellant to China. Upon the hearing before the district judge it was admitted that appellant was unlawfully in this country, but it was insisted that the order for his deportation to China was erroneous, and without support in the evidence. There was put in evidence on the hearing a certificate issued by the comptroller of customs at Vancouver, B. C..

bearing date May 21, 1891, permitting Chong Sam to return to Canada. It was also shown that appellant had been arrested at Detroit, June 23, 1891, for being unlawfully within the United States, and on that charge was brought before Commissioner Graves, who, finding the offense established, directed his removal to Canada, as "the country whence he came." The testimony taken on the hearing before the district judge was uncontradicted that appellant had carried on the business of a laundry-man for several months at Chatham, Ont. There was no evidence when he landed in Vancouver, or left China, and nothing tending to prove that when he departed from that country he did so with the purpose of coming to the United States.

*Cyrus A. Hovey* and *G. X. M. Collier*, for appellant.

*T. F. Shepard*, U. S. Atty., and *J. W. Finney*, Asst. U. S. Atty., for the United States.

SWAN, J. The legislation involved in this inquiry is mainly contained in three acts of congress, entitled, respectively, "An act to execute certain treaty stipulations relating to Chinese," approved May 6, 1882, (22 U. S. St. at Large, 58;) an act "To amend an act to execute certain treaty stipulations relating to Chinese, approved May 6, 1882," approved July 5, 1884, (23 U. S. St. at Large, 115;) and "An act to prohibit the coming of Chinese laborers to the United States," approved September 13, 1888, (25 U. S. St. at Large, 476.) These statutes, with the act entitled "An act, a supplement to an act entitled 'An act to execute certain treaty stipulations relating to Chinese,' approved the 6th day of May, 1882," approved October 1, 1888, (25 U. S. St. at Large, 504,) the provisions of which are not material here, form the system of laws commonly called the "Chinese Exclusion Acts," upon the justice and expediency of which public sentiment is divided. By some they are bitterly denounced, as unjust and alien to our form of government; and by others are zealously approved, as salutary and necessary defensive legislation against the influx of a noxious class, whose residence in our midst is detrimental to the moral and material interests of the country. The causes which led to this legislation, and the substance of the acts of 1882 and 1884, are fully stated in the opinion of Mr. Justice FIELD in the *Chinese Exclusion Case*, 130 U. S. 581, 9 Sup. Ct. Rep. 623, which affirmed the constitutionality of the act, October 1, 1888, and, inferentially, of the preceding acts. With the abstract rectitude or expediency of these laws the courts have no concern; that is a consideration solely for the law-making power. The questions in this appeal are purely problems of statutory construction. The admission that appellant is a Chinese laborer, unlawfully in the United States, makes it the duty of the court, if this appeal lies, to order his deportation "to the country whence he came."

On the part of the United States it is contended—(1) That section 13 of the act of September 13, 1888,[1] is not in force; and, as no other stat-

---

[1] Section 13 provides that any Chinese person convicted before a commissioner of being unlawfully in the United States may, within 10 days, appeal to the judge of the district court.

ute gives the right of appeal from the decision of the commissioner in this class of cases, the court is without jurisdiction to review the action of that officer. (2) That, if section 13 is in force, and the appeal well taken, the facts require the affirmance of the ruling of the commissioner that China is the country whence appellant came.

*First.* It is admitted that, unless section 13 of the act of September 13, 1888, gives jurisdiction of this appeal, it must be dismissed, and the order of deportation to China be carried out. The argument against the jurisdiction of this court is founded primarily on the language of section 1 of the act of September 13, 1888: "That from and after the date of the exchange of ratifications of the pending treaty between the United States of America and his imperial majesty, the emperor of China, signed on the 12th day of March, *Anno Domini* one thousand eight hundred and eighty-eight, it shall be unlawful for any Chinese person, whether a subject of China or any other power, to enter the United States, except as hereinafter provided." That the treaty is not yet ratified, and, therefore, the entire act is as yet contingent and inoperative. To this I cannot assent. The preamble of the treaty of 1880 with China, which authorized this legislation, expressly states that the United States desired to modify prior treaties permitting immigration of Chinese laborers, and by article 1 provides that "the limitation or suspension [of the coming and residence of Chinese in the United States] shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers; other classes not being included in the limitations." 22 U. S. St. at Large, 12. The purpose of the act under discussion is expressed in its title, "An act to prohibit Chinese laborers coming to the United States." This, too, is the scope and intent of the original act of May 6, 1882, the preamble of which reads: "Whereas, in the opinion of the government of the United States, the coming of Chinese laborers to this country endangers the good order of certain localities within the territory thereof, therefore, be it enacted by the senate and house of representatives of the United States of America in congress assembled," etc. This preamble is preserved *in ipsissimis verbis* in the amendatory act of July 5, 1884, (23 U. S. St. at Large, 115 ) The act of September 13, 1888, has the same object in view. It is obviously divisible into two parts. The first, which embraces sections 1, 3, and 4, is contingent upon the exchange of ratifications of the treaty mentioned in section 1. There can be no doubt that the language of that section withholds all present force and effect from the provisions of sections 2 and 4 until the contingency named shall have occurred. The immediate subject-matter of those sections is, however, subordinate and ancillary to the chief purpose of this act, and the prior legislation to the same end, all of which it substantially embodies, viz., the exclusion of Chinese laborers. As part of the methods or machinery to the accomplishment of that purpose, and in contemplation of the treaty, which had been signed, and only lacked ratification, and which it must evidently be assumed sanctioned the proposed restrictions on the entrance of all Chinese persons, as an aid to the exclusion of Chinese laborers, congress conditionally enacted sections 2 and 4. Under the prior acts "all Chinese persons other than laborers"

were permitted to come into the United States upon compliance with the requirements of section 6 of those acts, prescribing as means for the immigrant's identification a certificate by the Chinese government, giving his vocation, name, signature, physical description, and peculiarities and other particulars. These conditions of entry of Chinese persons "other than laborers" were enacted, professedly and in terms, "in order to the faithful execution of the provisions of this act." Section 6, Act July 5, 1884; section 6, Act May 6, 1882. Those acts having apparently proved insufficient as means to the end in view,—the exclusion of laborers,—the more stringent provisions of sections 2 and 4 of the act of September 13, 1888, were devised, by which the privilege of entry before granted to "Chinese persons other than laborers" should be narrowed to "Chinese officials, teachers, students, merchants, and travelers for pleasure or curiosity," (who should conform to the requirements of section 2,) with the evident purpose of preventing evasions of the acts by laborers falsely claiming to belong to the exempted class. All Chinese persons not within this last category, whatever their vocation might be, were to be absolutely denied entrance into the country. To avoid the hardship which the immediate application of these limitations and conditions might entail upon Chinese persons other than laborers, then *en route*, and who were neither "officials, teachers, students, merchants, nor travelers for pleasure or curiosity," the operation of sections 1 and 2, and consequently of section 4, was postponed until the exchange of ratifications of the pending treaty. Section 15 delayed to the same event the repeal of former acts. But this by no means qualified the operation of the remainder of the statute. To give that effect to the restraining words of section 1 is to disregard entirely the peremptory language of section 5, "from and after the passage of this act," and its cognate sections relative to the return here of Chinese laborers, and to insert in absolute enactments qualifications and restraints not derivable from their terms. Beyond this, that interpretation would subordinate the very end and aim of the act, viz., the exclusion of Chinese laborers, to the contingent operation of this secondary provision, which is but one of the aids to the end to be accomplished. By sections 5, 6, and 7 new conditions are imposed for the readmission of returning Chinese laborers, and the privilege of re-entering "from and after the passage of this act" is limited to the laborer who "has a lawful wife, child, or parent in the United States, or property therein of the value of one thousand dollars, or debts of like amount due him and pending settlement," and who shall make the proofs required by the rules and regulations prescribed from time to time by the secretary of the treasury, and present the certificate of return which section 7 provides "shall be the sole evidence given to such person of his right to return." Section 8 gives to the secretary of the treasury authority to make and prescribe, and from time to time change and amend, such rules and regulations, "not in conflict with this act," necessary and proper to conveniently secure to such Chinese persons as are provided for in articles 2 and 3 of the pending treaty, and as shall protect the United States against the coming and transit of persons not entitled to

the benefit of the provisions of said articles, etc.    While the persons to be affected by the rules and regulations thus authorized are described by reference to the unratified treaty, the authority granted is *in præsenti*, and its exercise is not made contingent upon the fate of the treaty.    Its only limitation is that imposed by the words "not in conflict with this act," which subordinates the privilege of entering the United States to the three preceding sections, which, as existing laws, are not to be overridden or repealed by a treaty, unless the latter is self-executing.    *Whitney* v. *Robertson*, 124 U. S. 190, 194, 8 Sup. Ct. Rep. 456; *Head Money Cases*, 112 U. S. 580, 5 Sup. Ct. Rep. 247; *Chinese Exclusion Case*, 130 U. S. 581, 600, 9 Sup. Ct. Rep. 623.    It is no objection to this construction that the power to make rules and regulations will equally avail should the treaty be ratified.    Sections 9 and 10 and 11 impose penalties for the offenses created by those sections and sections 5, 6, and 7. These are confined to bringing into the United States, landing, attempting, or permitting to be landed therein any Chinese laborer or other Chinese person "in contravention of the provisions of this act," and the counterfeiting, uttering, etc., of "any certificate herein required."    Under the peremptory language of the first clause of section 5 one charged with a violation of section 9, or under section 11, with forging, uttering, etc., the certificate required by section 7, would need a better defense than the plea that sections 2 and 4, the breach of which are not necessary ingredients of the offense, were not yet in operation.    Section 12 is also plainly and absolutely an imperative measure, equally conducive to the enforcement of the act, whether the treaty be ratified or not.    The provisions of sections 5 to 10, inclusive, as applied to Chinese laborers in the United States November 17, 1880, the date of the prior treaty with China, are clearly in contravention of the right of return given to such laborers by that treaty.    While this is no objection to their validity under the decision of the *Chinese Exclusion Case*, 130 U. S. 581, 9 Sup Ct. Rep. 623, the fact suggests a probable reason for the granting of the right of appeal conferred by section 13.    Having largely curtailed the right of return given by the treaty of 1880 and recognized by the Acts of 1882 and 1884, congress would seem to have intended, in conceding an appeal, to provide an additional safeguard against the exclusion of those laborers who, because of wife, child, or parent, or the requisite property in this country, were excepted from the operation of said sections 5, 6, and 7.    The spirit of our institutions favors the right of appeal, and it ought not to be denied, unless such is the plain intent of the law.    But, however this may be, the jurisdictional question is determined by the language of the section and that of the act of which it is a part.    With the exception of the right of appeal which it gives, and the definition of the process for the removal of the offender on conviction, it is substantially and almost literally a reproduction of section 12 of the act of July 5, 1884, though its clauses are transposed.    Nothing in its language discloses the slightest intent on the part of congress to make it a contingent enactment, or restrain its immediate operation. The words of Lord COKE may be well applied to it: "This is a case

where the words are plain without any scruple, and absolute without any saving." 2 Inst. 533; Dwar. St. 519; Sedg. Const. Law, 58. It is well settled that a statute takes effect on the day of its approval by the executive, and includes that day, unless its operation is postponed by its own terms. *Matthews* v. *Zane*, 7 Wheat. 164; *Arnold* v. *U. S.*, 9 Cranch. 119; *Lapeyre* v. *U. S.*, 17 Wall. 198; *In re Richardson*, 2 Story, 571; *The Ann*, 1 Gall. 62; *Weed* v. *Snow*, 3 McLean, 265; *In re Welman*, 20 Vt. 653; *American, etc., Paper Co.* v. *Glens Falls Paper Co.*, 8 Blatchf. 513. The phraseology of section 13, the express language of section 5, and the absence of implication, as well as reason, to the contrary, require section 13 to be held as in force from the passage of the act. The contingency which postpones other sections does not affect it. *Robertson* v. *Bradbury*, 132 U. S. 491, 493, 10 Sup. Ct. Rep. 158. The act of October 1, 1888, revoked all privileges conferred by sections 5, 6, and 7, but left the remainder of the act of September 13, 1888, untouched. For the reasons stated the objection to the jurisdiction is, in my opinion, not tenable, and the appeal is well taken.

*Second.* The next proposition urged by the United States is, substantially, that all Chinese persons, not subjects by birth or allegiance of any other power than China, found unlawfully in the United States, are required to be removed to China. While in the case at bar it would seem to be a conclusive answer to the position taken by the government that upon elementary principles the judgment of Commissioner Graves of June 25, 1891, ordering appellant's return to Canada, is a final adjudication of the *status* of appellant, as the commissioner had jurisdiction of the parties and the subject-matter, my conclusions are not based on that ground alone. The acts of May 6, 1882, July 5, 1884, and September 13, 1888, all provide that any Chinese person found unlawfully in the United States shall, after conviction upon hearing before a justice, judge, or commissioner of the United States, "be removed from the United States to the country whence he came." These authorize the deportation from the United States of any person of that race, whatever his vocation, not lawfully here, (*Wan Shing* v. *U. S.*, 140 U. S. 424, 11 Sup. Ct. Rep. 729,) from whatever country he may come. It is true that, if a Chinese laborer leaves China intending to reach the United States through contiguous foreign territory, and enters by that route, China is "the country whence he came," and to which he should be removed, and not the adjacent country through which he made his journey, and that this rule should apply when the accused has sought to evade the law by delaying his arrival in the United States as his objective point. But it does not follow from these premises that the words, "to the country whence he came," are simply a *periphrasis* for the words, "to the country of which he is a subject by birth or allegiance." Yet this contention is absolutely necessary to sustain the argument that a Chinese laborer unlawfully here must show that he is a subject of another power than China to avoid remand to his native country. Three considerations are urged in support of this construction: (1) That the policy of the government evinced in this anti-Chinese legislation constrains this interpretation; (2) that a con-

struction of the law which permits the remand to Canada of Chinese laborers, not subjects, in the strict sense, of that dominion, would leave the remanded persons free to repeat their attempts to enter this country, and subject the United States to the expense of their return as often as the experiment failed; (3) that the use of the word "subject," in section 15 of the act of 1884[1] and section 1 of the act of September 13, 1888, restricts the meaning of the phrase, "to the country whence he came," and makes it to mean "the country of which he is a subject," and this interpretation is supported by the language of the appropriation acts of 1890 and 1891. To the first of these propositions—founded on the policy of the government—but little weight can be accorded in the face of language so plain and unambiguous as that under discussion. "What is termed the 'policy of the government' with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each varying from the other, may be found by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes." Per FIELD, J., in *Hadden v. Collector*, 5 Wall. 107, 111. The second point is the argument *ab inconvenienti*. This makes as strongly against as for the position it seeks to support. The attractions of free transportation across the continent and the Pacific ocean are, to that class, more than compensation for the discomforts and detention of arrest and hearing preliminary to the return journey, and the expense of returning such immigrants to China would far exceed that of transferring them across the border. It was not the purpose of this act to invite, but to repel, this class of immigrants; not to make contiguous foreign countries experimental domiciles, from which the laborer can, at his pleasure, return to China at the expense of the United States. That the consequences are to be considered in expounding laws when the intent is doubtful is, as held in *U. S.* v. *Fisher*, 2 Cranch, 390—

"A principle not to be controverted * * *; but when only a political regulation is made, which is inconvenient, if the intention of the legislature be expressed in terms which are sufficiently intelligible to leave no doubt in the mind, when the words are taken in their ordinary sense, it would be going a great way to say that a constrained interpretation ought to be put upon them to avoid an inconvenience which ought to have been contemplated by the legislature when the act was passed, and which, in their opinion, was probably overbalanced by the particular advantages it was calculated to produce."

The same rule of interpretation is held in *The Cherokee Tobacco*, 11 Wall. 616, 620. To quote from that case:

"The section must be held to mean what the language imports. When a statute is clear and imperative, reasoning *ab inconvenienti* is of no avail."

Equally emphatic to this point are *U. S.* v. *Wiltberger*, 5 Wheat. 95, 96; *Lewis* v. *U. S.*, 92 U. S. 618, 621.

[1] Sec. 15. The provisions of this act shall apply to all subjects of China and Chinese, whether subjects of China or any other foreign power; and the words "Chinese laborers" shall be construed to mean both skilled and unskilled laborers, and Chinese employed in mining.

It has not yet been held that when the penalty attached by law to an offense is insufficient to deter its repetition, a court would be warranted in increasing the punishment, or straining a statute by construction to effect that end. Again, to take the liberty with the plain words of the statute necessitated by the argument in behalf of the United States, and construe the words "whence he came" to mean the country "of which he is a subject by birth or allegiance," is so great a departure from elementary canons of statutory interpretation that nothing less than the clearest necessity would justify it. It is not enough that the construction proposed would be more efficient in excluding the undesirable class. If such were the intention of congress, the language chosen to that end is singularly inapt to its expression. "The case must be a strong one indeed," says Chief Justice MARSHALL in *U. S.* v. *Wiltberger*, 5 Wheat. 95, 96, "which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest." The argument is founded on the words, "any Chinese person, whether a subject of China or any other power," but that phraseology is broadly descriptive of the race prohibited from entering, and forbids any exception because of the political relation individuals of the race may hold to any country. In the language of the law of nations, as applied in the interpretation of treaties, "a person domiciled in a country, and enjoying the protection of its sovereign, is deemed a subject of that country." *The Pizarro*, 2 Wheat. 246. It is in this general sense that the word "subject" is used in the clauses referred to; not in its strictest meaning.

It is incidentally argued that appellant has no domicile in Canada, and, although he had acquired one, having put himself *in itinere* for the United States, he has lost the domicile of choice, and that of origin reverts, and requires his removal to China, and that he has the burden of disproving a continuance of his native domicile. The evidence is that appellant resided and carried on a laundry at Chatham, Ont., for four months, and had been in that province for a considerable time before that period. He had in his possession a return certificate, issued by the Canadian officials at Vancouver, granting him leave to return to the dominion of Canada. Beyond his attempts to enter the United States, there was nothing to show he left China with the ulterior purpose of coming to this country, or that he had abandoned whatever domicile he had acquired in the dominion of Canada. Upon these facts there is a concurrence of acts and intention sufficient to the acquisition of a Canadian domicile. A right of domicile may be acquired by a residence of a few days. *The Venus*, 2 Cranch, 253. "When an old domicile is definitely abandoned, and a new one selected and entered upon, length of time is not important. One day will be sufficient, provided the *animus* exists." *Craigie* v. *Lewin*, 3 Curt. Ecc. 435; Whart. Confl. Laws, §§ 58, 66. It is actual residence with the intention of remaining indefinitely, not a purpose of permanent residence, that is essential to the acquisition of a new domicile. *Anderson* v. *Watt*, 138 U. S. 706, 11 Sup. Ct. Rep. 449; *Mitchell* v. *U. S.*, 21 Wall. 350; *Kennedy* v. *Ryall*, 67 N. Y. 379; *Ennis* v. *Smith*, 14 How. 422. In the last case it is said:

"But what amount of proof is necessary to change a domicile of origin into a *prima facie* domicile of choice? It is residence elsewhere, or where a person lives out of the domicile of origin. That repels the presumption of its continuance, and casts upon him who denies the domicile of choice the burden of disproving it. Where a person lives is taken to be his domicile, until other facts establish the contrary. * * * When there is a removal, unless it can be shown or inferred from circumstances that it was, for some particular purpose, expected to be only of a temporary nature, or in the exercise of some particular office or calling, it does change the domicile."

"The place where a person lives is taken to be his domicile until facts adduced establish the contrary; and a domicile, when acquired, is presumed to continue until it is shown to have been changed." *Anderson* v. *Watt*, 138 U. S. 706, 11 Sup. Ct. Rep. 449.

Nor do the facts suffice to show that appellant's native domicile has revived. Though domicile of origin "easily reverts," the renunciation of the acquired domicile must precede the reversion, and be established by satisfactory evidence of the co-operation of act and intent to that end. A domicile of choice, once acquired, excludes neither a temporary absence nor a future change, the reservation of which faculty is plainly implied. Savingy's System, etc., § 353; Jac. Dom. § 175, note; *Ex parte Kenyon*, 5 Dill. 385. In order to lose the domicile of choice and revive that of origin it is not sufficient for the person to form the intention of leaving the domicile of choice, but he must actually leave it, with the intention of leaving it permanently. *Chalmers* v. *Winfield*, 36 Ch. Div. 400; *Doyle* v. *Clark*, 1 Flip. 536; *Kemna* v. *Brockhaus*, 5 Fed. Rep. 762. One who visits his native land, intending to return to his adopted country, does not lose his domicile of choice. *The Friendschaft*, 3 Wheat. 14, 51, 52. The certificate of leave to return to Canada held by appellant is, in the absence of proof to the contrary, evidence of his intent to return to his domicile of choice, and repels *prima facie* any purpose of abandoning that domicile permanently.

The language of the appropriation acts of August 30, 1890, (26 U. S. St. at Large, p. 387,) and of March 3, 1891, (Id. p. 968,) setting apart, respectively, $50,000 and $60,000 for "expenses of returning to China all Chinese persons found to be unlawfully in the United States," is cited as showing that the legislative construction of the acts under discussion agrees with that here claimed, and requires deportation to China of all Chinese, not subjects, in the strict sense of that word, of another power. To this there are several obvious answers: (1) There is no indication that congress intended to construe the words, "to the country whence they came," or to declare their meaning. No such purpose is declared or manifested. Something more than loose language in an appropriation act is needed to make a change so radical in a system of laws carefully framed and amended. (2) To declare what the law is or has been is a judicial power; to declare what the law shall be is legislative. *Ogden* v. *Blackledge*, 2 Cranch, 272, 277; *Koshkonong* v. *Burton*, 104 U. S. 668, 678; *In re Landsberg*, 11 Int. Rev. Rec. 150; Cooley, Const. Lim. pp. 93, 95, and cases cited. (3) The appropriations referred to are intended apparently as partial reparation for the hardship inflicted

upon returning Chinese by the cancellation of the return certificates, in reliance upon which they may have embarked for this country. (4) A conclusive answer is found in the fact that, if congress meant that all Chinese persons found unlawfully here should be returned to China, that purpose would have been expressed in the words "to China." The phrase used is cogent that it was the purpose of congress that the judgment of deportation should be conformed to the domicile of the offender, not to his nativity. The duty devolved upon the justice, judge, or commissioner before whom the accused may be brought is not merely that of finding that the offender is unlawfully here, and must be removed, but the ascertainment of "the country whence he came," which inquiry is not foreclosed by the determination of the offense charged and the race and occupation of the offender; nor is it merely a perfunctory duty, and a corollary from such determination, as the argument for the United States would make it. While the power of the sovereign authority to exclude foreigners from our shores is unlimited, that of deportation is qualified by international law, which does not permit a nation to make a penal colony of another country, or compel that country to receive back such of its subjects as have voluntarily selected a domicile elsewhere. The banishment of offenders to their native country or that of their ancestors, regardless of the political rights of the individual and his relations to another power, may prove a just ground of international complaint. The right of individual expatriation is now held by the leading civilized powers of the world, and by none more strongly than our own country. 2 Whart. Int. Law Dig. § 171. The comity of nations requires that this right should be respected, and the act of congress evidently recognized it in the use of the flexible phrase, "to the country whence he came." The same language appears also in "An act to regulate immigration," approved August 3, 1882, (22 U. S. St. at Large, 214,) where the determination of the country to which immigrant convicts shall be sent is held by the department of state to involve judicial action for its ascertainment. 2 Whart. Int. Law Dig. § 206. The imperfections of the law, the extent of our boundary line, the facilities it affords for the repetition of attempts to enter the country, and the want of co-operative legislation in adjoining countries, combine to make the exclusion of this class most difficult; but these are evils to be remedied by the legislative and state departments, not by the judiciary.

It is perhaps needless to say that every charge of the violation of these acts must be decided upon its own facts. The importance of the question, the frequency of these cases, and the view taken of the law in other departments of the government, demand and have received careful consideration. District Judges WHEELER, of Vermont, and HANFORD, of Washington, are reported to have affirmed the right of appeal under section 13, and to have given a similar construction to the words, "country whence he came;" but their opinions had not been reported, nor were they accessible, until after this had been completed.[1]

[1] See In re Mah Wong Gee, 47 Fed. Rep. 433; In re Leo Hem Bow, Id. 302; United States v. Ah Toy, Id. 305; United States v. Jim, Id. 431.

The order of the commissioner directing the deportation of appellant to China is reversed, and the marshal is instructed to cause him to be removed to Canada.