New York County.—HON. D. C. CALVIN, Surrogate.— March, 1881.

Tucker *v.* Field. °

*In the matter of the probate of the will of* Julia M. Stanton, *deceased.*

A citizen and resident of this State could not establish a domicil in France, under the empire, without an authorization of the emperor, under chap. 1, § 13, of the Code Napoleon.

The recital, in a will, that the testator, at the time of execution, is residing at a place named, is not controlling, the term residence being commonly employed in the sense of sojourn.

The fact that a will, executed in a foreign country by one whose domicil of origin is in this State, is executed with the formalities prescribed by the laws of this State, raises a presumption in favor of an intent to retain such domicil.

A party alleging a change of domicil from that of origin holds the burden of proof.

Considerations addressed to the intelligence and good feeling of a testator, which leave him still to his independent choice, or which influence his better judgment, cannot be regarded as undue, to the extent of affecting the validity of the testamentary act.

The testatrix died in 1878, at the age of eighty-four, in Paris, where she had chiefly dwelt since 1869, leaving a will executed in 1877, at the American Legation there, in conformity to the laws of this State, whereby she gave

the bulk of her estate, consisting of personal property, to two daughters, her only children. The evidence, with respect to her statements and other acts, during her life-time, as indicating an intent to retain or change her domicil, was conflicting. She had executed a previous will in this State, dividing her property equally between her daughters; but the one propounded gave much more to one of them who had become a widow, and was without means of support, while the other was in comfortable circumstances,—the effect being to about equalize their incomes. It appeared that the testatrix had latterly been under the care and influence of the widowed daughter, who had solicited the alteration in the disposition of the estate, and had represented to her the change in condition which justified such an alteration, but it did not appear that any untrue representations had been made. Testatrix was possessed of remarkable mental vigor and a strong will. *Held,*

1. That the testatrix was domiciled in this State at the time of her death, she never having been authorized by the emperor, under the French Code, to establish a domicil in France.

2. That the influence shown was not undue, and that the instrument propounded having been executed conformably to the laws of this State, should be admitted to probate.

APPLICATION for the probate of a will.

The instrument propounded bore date July 14, 1877, and was witnessed by Henry Vignaud and Augustus Biesel.

It recited that the testatrix was late of the city and State of New York, then residing in Paris, revoked all former wills, and appointed John J. Cisco, of New York, executor. Testatrix directed all her debts, funeral and testamentary expenses to be paid, and then gave to her daughter, Eliza L. Tucker, formerly of New York, now of Paris, her furniture left in the house belonging to that daughter in New York, with certain pictures, describing them ; to her daughter, Julia M. Field, late of New York, now of Paris, such an amount in bonds as will yield to her an annual income of $2,300, said bonds being in the care and custody of her trustee and executor, Cisco, to whom she intrusted the valuation and appraisal ; also

silver-plate, a picture, and jewelry; to her granddaughter, Julia S. Tucker, residing in France, she gave certain silver-plate, and authorized her executor to give her said granddaughter out of New York city bonds, in his custody, sufficient to replace $3,000, value of a bond supposed to have been lost by her husband; to her granddaughter Fanny Boulton, late of Paris, now of India, jewelry and laces; to her four grandsons, naming them, her late husband's library. The residue of her property she bequeathed equally to her two daughters Eliza L. Tucker and Julia M. Field, and recited that Mrs. Tucker had received more largely than Mrs. Field from the estate of her father, and was possessed of property yielding an income adequate to her maintenance; that Mrs. Field would be destitute, but for the provision made for her. In case Mr. Cisco should not consent to act as executor, she appointed Charles F. Stone, of New York, as her executor and trustee; then, on reflection, she annulled the item of the library of her husband, and gave the same to her granddaughter Fanny Boulton.

The will was propounded by decedent's daughter, Julia M. Field. Mrs. Tucker, decedent's other daughter, filed objections to the probate: that the instrument was not executed according to the laws of this State; that decedent was not of sound and disposing mind, but under restraint, and unduly influenced by Mrs. Field, and other persons unknown; that the instrument, if executed, was so executed by reason of misstatement and misrepresentation made to her, by Mrs. Field and other persons unknown to contestant, in regard to proponent and contestant, and their respective circumstances, and it did not express her true wishes; that shortly before

its execution she expressed her testamentary purpose, but by undue influence was induced to change the same ; and that the decedent, at the time of her death and execution of the will, was domiciled at Paris, France, and the will was not executed according to the laws of France.

Proponent read in evidence :

1. The deposition of Henry Vignaud, one of the subscribing witnesses, taken on commission in Paris, who testified that he resided in France, and was second secretary of the United States legation ; that he was not acquainted with decedent, and had no recollection of the circumstances attending the execution of the will, but, after reading the attestation clause signed by him, he was satisfied that it was executed at the legation, in his presence, and that decedent declared the same to be her last will and testament, and requested him to sign the same as a witness ; that though he had no recollection of what took place, he was positive that everything was done in the manner in which such things were generally done at the legation ; that testatrix first signed the instrument, and declared it to be her last will and testament, and requested Mr. Biesel and witness to sign as witnesses, and they did so in her presence, and in the presence of each other ; that he had no recollection as to her soundness of mind at the time, but he would have declined to act as a witness if anything had occurred to lead him to suppose she was unsound or under restraint ; that he did not know her age, or whether she came to the legation alone, and that he had no previous acquaintance with her ; that Mr. Washburne, then minister to France, was present.

2. The deposition of the other subscribing witness, Augustus Biesel, taken on commission in Paris, who testified that he resided in Paris, that he was a messenger at the legation ; had no acquaintance with decedent ; saw her there on the occasion of the execution of her will, when he was present, and that he was a subscribing witness ; that the testatrix declared the instrument to be her last will and testament, in his presence, and requested him to witness the same, in the presence of the persons named ; that Mr. Vignaud was also requested to act as a witness by her ; that he signed in the presence of witness and Mr. Washburne ; that decedent appeared to be a person of sound mind, and under no restraint.

Contestant then read in evidence :

1. The deposition of Mrs. Julia Tucker Clark, taken on commission in Paris, who testified, that she knew decedent, who was witness's grandmother, and died in January, 1878 ; she knew proponent and contestant ; the former was her aunt, and resided in Paris ; Mrs. Eliza Tucker was her mother, residing in Geneva, Switzerland ; decedent left two children, proponent and contestant ; witness was born in New York, and resided in Paris at decedent's death, and had since 1869 ; prior to that in New York ; witness resided in the same house with her from 1868 to 1870, 1873 to 1874, 1875 to 1876, and from June, 1877, to June, 1878, she saw her every day, during the summer; her relations with decedent were friendly ; witness's mother was in the house with decedent from 1869 until her death, except in the year 1873, and from June to December, 1877 ; witness's sister Fanny lived there from 1869 to June, 1875 ; decedent made her will before she left America, and left it with

John J. Cisco, whereby she divided her property equally between her two daughters. Before witness went to America in 1874, she conversed with decedent, and asked her to put her mother's portion of the property in trust for witness and her sister ; but she answered that she had made her will, and was too old to make a new one, and that they must manage it after her death ; decedent was about eighty-four or eighty-five years of age at her death, was weakened in memory, and complained that she could not remember names from day to day ; that she was forgetting everything ; she was in that state in July, 1877, and for some months previous to her death ; she went out very seldom, during several months prior to July, 1877, and until her death ; she was accompanied by proponent and her son ; during the last years of her life she rarely wrote letters, or read those addressed to her, but procured some one to write for her, and read hers ; witness and proponent frequently read her letters to her ; witness wrote for her, but none of her business letters ; decedent kept her accounts herself, after she came to Europe, until 1875, and after that proponent kept them, as her judgment and decision were much en- feebled ; she was enfeebled in mind and body, peevish and unreasonable, subject to fits of speaking childish things. Shortly after contestant left for Geneva, in the summer of 1877, witness found decedent weeping because her dinner was not brought up, and said she should die ; witness had seen her violently excited and weep, because a milliner did not follow her instructions in making a cap or a bonnet ; proponent attended to all her business mat- ters, wrote letters, kept accounts, and signed checks, from June, 1875 ; prior to that witness's sister, who was

then married, had attended to those matters ; during the last years of her life, decedent was dependent on proponent, and was influenced in her judgment and decision by her ; she was influenced and prejudiced against her friends by proponent ; decedent told her she felt as if she was breaking up ; for several months prior to the summer of 1877 proponent and her son Julian were constantly with her, and on several occasions she found proponent reading letters to decedent, when she would immediately put them in her pocket, and change the conversation ; decedent became more and more infirm ; she did not live in the same house with proponent during any part of the year 1877, but proponent and her son were with her every day, especially after contestant left. After her death, proponent divided her effects, and in one of the drawers witness found decedent's papers and letters, and proposed to keep them, as they might be valuable, but proponent said "let us respect the letters of the dead—give them to me and I will burn them. When I die, I hope some one will perform the same charitable office for me ;" whereupon witness gave them to her ; witness never heard decedent speak of any other than the New York will, and learned that there was another from Mr. Cisco after her death ; she did not know of any friends of decedent in Europe, except Miss Stone, a grandniece, outside of members of her family, to whom she was accustomed to speak of her business affairs ; witness asked, after her sister's marriage, if she would not help to support witness, and she replied she could not, as she had to give so much to proponent, and to pay off her old debts.

On cross-examination, she testified that she could not

say she was not on friendly terms with proponent; that she had not seen her since she heard she was secretly and surreptitiously trying to defraud her mother out of her rights by a new will; felt unfriendly to her for that reason; in the winter of 1876–1877, witness's mother said to proponent that decedent was changing, breaking up, and that her memory was failing; witness did not institute the contest, but, as soon as she heard of the will, she proposed to proponent that she should have three-fifths, and witness's mother two-fifths of the money left by decedent, and she supposed it had been accepted, before she received notice from the Surrogate of New York; she did not think decedent was strong minded, or of good health, but was of very imperious disposition; she relied upon the advice of Mr. Buckingham and proponent, in business affairs, and was always liberal to proponent, though exacting to others; witness saw decedent nearly every day during the year 1877; she knew of decedent's feeble mind and unreasonable disposition from her conduct, and acts; witness had had no intercourse with Julian Field, since his duplicity with regard to the will.

2. A letter of Mr. Cisco to Mrs. Clark, dated March 12, 1878, in which he acknowledges the receipt of letter of February 25, and states that decedent sent her will to him for safe keeping; that, after decedent's death, he received a letter from proponent, which induced him to open the package then in his possession, when he found he was named as executor; that he had concluded not to act, nor would Mr. Stone, who was substituted and who had been applied to, without examining the will; that he wrote Julian Field of their declination, and recom-

mended that his aunt and mother should decide upon an administrator, and he proceeds to give the provisions of the will, the current price of New York bonds, and that proponent and contestant should decide upon an administrator. He also stated that he would not advise contestant, as her husband was competent to do so, and requested Mrs. Clark to show his communication to her mother, and that it be considered confidential.

3. Another, dated April 9, 1878, from Mr. Cisco to Mrs. Clark, acknowledging receipt of hers of March 26, wherein he denied that decedent's will was made on his advice, as stated by Julian Field, and stated that she never asked his advice, and he never gave it; that proponent informed her that she was not otherwise provided for, but contestant was, and wished him to advise decedent, which he declined; that she subsequently wrote him that decedent was going to make a new will; and asked about its proper execution for probate in New York, and he gave her the information; that he knew nothing of the contents till it was opened, and he declined to act as executor, because there would be a contest, and he had written to proponent, advising a satisfactory compromise, in which case he would consent to act.

4. A letter from E. B. Washburne, dated April 11, 1878, to Mrs. Clark, acknowledging receipt of letter from her, and stating that he did not advise decedent as to her will, but referred her to the witnesses, if she desired them to act, and that decedent requested the witness Beisel to forward the will to Mr. Cisco.

5. Another, from Mr. Cisco to Mrs. Clark, dated May 1, 1878, acknowledging one from her of April 17,

stating that she was entitled to a copy of the will, which he sent; that the last two letters of credit were payable to decedent or Mrs. Field, so the latter could draw the money, if decedent was unable to sign; that the instructions to decedent to destroy her first will were in her handwriting, and after her signature at the bottom of one of proponent's letters; that he had written to proponent, advising a compromise.

6. The deposition of Charles G. Clark, taken on commission, who testified that he knew proponent, contestant, and decedent, in 1877; that he was the husband of the witness, Julia T. Clark, who was a daughter of the contestant; knew Julian Field; that, after decedent's death, Mrs. Tucker returned to Geneva, and Julian soon after called upon witness to see his wife, and learn why her mother had refused to sign the paper sent from New York to admit the will to probate, saying it was done to save expense; and witness suggested to him that, as contestant was not in Paris, there was no immediate necessity of action, and they had better wait till Mr. Cisco was heard from; that Mr. Field said it was desirable the will should be speedily settled, and on witness asking him if the will was made in New York, he replied, "Yes;" witness requested his wife to write to her mother not to sign any paper, but write to Mr. Cisco for information as to the will, and that a reply came containing the will; that Julian informed him that, under the circumstances of the new will, it would be expected that a reasonable person would accept it, and that if contestant attempted to set it aside, he would make such revelations of the atrocious conduct of contestant towards decedent as would create a great scandal. On

cross-examination, he testified he was on friendly terms with proponent and Julian; that he could not say whether contestant would have acquiesced in the will, but for his advice and that of his wife.

7. The deposition of Mary Stone, taken on commission, who testified that she knew decedent since her childhood, and proponent and contestant; was not on intimate terms with them; she sometimes visited decedent, but not within the last two months of her life; she conversed with decedent about her property, its disposition and her will; she had two or three conversations in 1876, not later than the early part of November of that year, in Paris, at her residence; that she asked witness as to the advisability of changing her will, stating, as her reasons, that proponent's and contestant's circumstances had altered since her first will, which divided her property equally, and she desired to change it, and give proponent more; did not state details, but said contestant had an income, and proponent had none; she understood decedent to say her will was in New York; said nothing of one made in Paris; she was always reasonable at that time, but she never spoke of having changed her will; never spoke of proponent stating to her that Mr. Tucker had a large property; that proponent was present at one of her interviews within the period named, at decedent's room, when the intended change of the will was spoken of by decedent, but proponent said she thought the New York will was unjust to her, which decedent assented to, or decedent said it was unjust, and Mrs. Field assented; she never saw any indication of decedent's weakening mind or memory; she did not see her in the summer of 1877.

8. The deposition of Mrs. Eliza L. Tucker, taken on commission, who testified that she resided at Geneva, was a sister of proponent and daughter of decedent, and was contestant herein ; that she resided with decedent in Paris continually, except in 1873, till June, 1877, when she went to Geneva, leaving decedent with proponent ; decedent was always kind and affectionate in her relations with witness, but not so much of a companion as proponent, owing to witness's deafness ; about two years before her death, proponent took personal charge of her ; when she was living with decedent, she did not know she had made a will in America ; was under the impression that she casually remarked that her property was equally divided between proponent and contestant in America, and that the will was left with Mr. Cisco ; decedent was easily excited by trivial causes, and would become so if dinner was not brought in at proper time, or her bath not ready ; such things would produce fits of weeping ; was frequently childish in her conduct ; when decedent first went to Europe, contestant sometimes wrote business letters ; afterwards her daughter did so, paid her bills and kept her accounts until 1875, when she married, after which proponent attended to her mother's business, signed checks, etc. ; she procured Mrs. Boulton and proponent to read her letters ; decedent always consulted proponent as to matters of business, and was much biased under her influence and advice ; it was well-known to the family that decedent had made her will in America ; never heard her express any dissatisfaction with it ; never had any conversation with her or proponent, or any one prior to decedent's death, respecting the instrument propounded ; her

daughter wrote to Mr. Cisco, to inquire if there was a new will after the death of decedent, and after receiving a letter that there was, she wrote to witness at Geneva ; she received a letter from Julian referring to proponent ; he acted for his mother ; he called upon witness and showed her a letter from Mr. Cisco, and asked her to request Mr. Jackson to act with regard to the will, which she supposed was the old one, not having heard of the new ; proponent misrepresented witness to decedent, and made her think her income was larger than it was ; she had heard discussions between proponent and decedent about money matters, in which her mother always yielded ; and after she heard of the new will, she offered a fair compromise with proponent, which was refused ; Julian said that Mr. Cisco and Mr. Washburne and others advised his grandmother to change her will ; that witness stated that the decedent was afraid of proponent, and did not dare to contradict her.

On cross-examination, she testified she was on good terms with the proponent ; she was with decedent when she died ; that she was, and still is, the owner of a house in Twenty-third street, New York, unincumbered.

9. A letter addressed to contestant, without date, avenue Friedland, Paris, written by Julian, stating that decedent's will was her own idea, and justified in the eyes of all ; as, since the first one, Fanny's marriage, and his father's death, leaving his mother entirely dependent on decedent, had changed the circumstances and justified the change ; that it was the opinion that decedent left very little, and it remained for proponent and contestant to have the pittance settled according to law, and talk about matters afterwards ; after it was settled

she would be at liberty to take any exceptions she desired, to the details ; it was never too late to dispute a will ; it was a great thing to keep the money in the family ; and advised her to go before the United States consul with her husband, and to accept the will of her mother, as she knew decedent had acted according to the dictates of her conscience ; if she would forward such a statement to him, he would cable it to Mr. Cisco, and then send the document ; she knew as much about the new will as he or his mother did ; decedent had endeavored to make proponent and contestant equally comfortable, and given $3,000 to Julia, to make up for the lost bond, which would, of course, come to contestant, as Julia was so well off ; that the details of the will were approved by Mary Stone, Mr. Cisco, and Mr. Washburne, who thought her decision and arrangement correct and best ; it was signed before Mr. Washburne, who had no possible interest in what she performed ; he could not remember the terms of the will ; on much reflection and advice he thought, if she would sign the document suggested, it would result in decedent's money remaining intact, instead of getting into the hands of New York lawyers, and if she did not, a commission would be sent out at an expense of $250, there would be great delay, and the estate frittered away in fees and legal expenses ; not to take Boulton's advice, but George's, who had more common sense, and he would give his mother advice suited to the case ; asked her to sign the document to save expense and delay, saying that she would have time afterwards to discuss any clause or provision which she did not like, and that she should rely on decedent's justice, and should be unwill-

ing to call in question, or dispute, her last wishes, etc. Three other letters, from the same writer, of similar tenor, were read.

10. A letter from Mr. Buckingham, addressed to contestant, signed C. B., dated March 15, 1878, from New York, expressed his astonishment at the terms of the will, which he saw in Mr. Cisco's hands; stated that the will was safe in the latter's hands; that he had a new last will and testament of decedent; that proponent had written to two persons in this city to influence her mother to make a will, and make her income equal to contestant's, as an excuse for a change in the old; that he thought Mr. Cisco and Mr. Stone would act as executors, if they would agree to set the new will aside, and abide their arbitrament for an equal division of the estate, with reference to their respective pecuniary condition; that nothing could be done with the new will, because the executors refused to act, except by consent of the heirs, and that the contest would involve great expense and delay, and in the meantime the legatees could not draw anything to carry on litigation, or for support, except by order of court, and referred to the necessities of the proponent, which, with her sense of justice and kindred, should lead to a compromise of the will soon; that decedent's estate was $45,000, in New York city seven per cent. bonds, worth twelve per cent. premium, and could be sold immediately; that the only deposit decedent left with Mr. Cisco was $45,000 in United States bonds of 1862, and some $3,000 or $4,000 in money, which had been drawn out.

11. The deposition of Valerie Wright Forbes, taken on commission, who testified that she was the wife of

Paul S. Forbes, who had been acquainted with decedent from 1871 to her death; that decedent had always spoken of remaining in Paris, as her home, and she never expected to leave, and in her conversation always expressed her intention of remaining there for the rest of her life; that her mind was perfectly clear, and health and spirits good.

On cross-examination, she testified that she was domiciled at rue Balzac, and she meant by domicil, where one had their home, where they had established their residence, with the intention of remaining; decedent said her home was in Paris and in New York; that was her general conversation, she could not specify particulars; her exact words were that she "never expected to return to America, on account of economy, and liked it better;" she never expressed a desire to return; No. 4 rue Balzac was a family hotel, where the conversations took place, but she could not state the dates.

12. The deposition of Mrs. Julia T. Clark, taken under commission in Paris, who testified that she resided in Paris; knew decedent, who was her grandmother, and lived at No. 4 rue Balzac from 1865 till her death, which was her home, domicil or residence; she knew decedent to make Paris her permanent home, residence or domicil, and she told her she intended to live in Paris during her life-time; witness went to America in 1874, and decedent told her to give her love to her friends and tell them she should never see them again, as she would never be able to go to America; at another time, she told her to be sure to have her body sent to America, when she died; she liked Paris better than any other place; herself and family were all there, and her

health was better, and it was economical; her mind was good from 1865 to her death, and her spirits cheerful; she was in such bodily health as to stand a voyage, if she had desired to go to America, and had money enough to pay her expenses and return ; and constantly expressed her intention to remain in Paris, as her home and domicil.

On cross-examination, she testified that she was not one of the contestants, but her mother was a contestant, and that witness would lose a legacy if the will was set aside ; on several occasions when she urged decedent to go back to America, she said she should never go back, and asked witness to see her body placed in the family vault ; witness did not see that her body was taken back to America, but its transportation was undertaken by her estate ; decedent lived with witness's mother in New York before she went to Europe, and paid part of the expenses ; she came to Europe in 1865 and 1866, and brought witness's sister Fanny with her ; witness arrived in 1867 ; decedent never left Paris, winter or summer, except from August, 1870, to June, 1871 ; decedent was living in Paris and paid a portion of the rent ; decedent went to Nice, and returned to Paris, and remained at rue Balzac, from the beginning of 1869 to her death in 1878 ; there was no break except that produced by the war, when she went to Le Mans and Trouville, accompanied by contestant and proponent and witness's sister, and returned to Paris, May or June, 1871 ; she desired the will to be broken, in the interest of her mother ; decedent's remains were in the cemetery at New York.

13. The deposition of Henrietta N. La Romaine Meilhau, taken on commission, who testified that she resided

at 4 rue Balzac ; was acquainted with decedent for near-ly ten years ; who lived in her house at that time, but went with witness to Le Mans during the war, and con-versed with decedent every day ; she said she should like to return to America to see her friends in America, but she was too old ; that decedent was always permanently established in France ; she was perfectly strong enough in body to stand a voyage if she chose ; said she liked France, and French people and manners, and that the climate agreed with her.

14. The deposition of Edward Harrison May, taken on commission in Paris, France, who testified that he knew decedent for twelve years ; he used to live in the same house with her ; often conversed with her about her former home, but not about any other ; that she died at No. 4 rue Balzac.

Proponent then read in evidence :

1. The deposition of Mrs. Mary L. Stone, taken on commission, who testified that she knew decedent all her lifetime, and was called upon by Mrs. Clark, last sum-mer, to testify what she knew of decedent's intention in making her will, as to her competency ; and she testi-fied that decedent was competent, but never told her what her intentions were ; that she spoke of her prefer-ence for America, and expressed her intention of return-ing.

2. The deposition of Mathilde Flandin, taken on commission, who testified that she resided in Paris, and knew decedent for twenty years, both in New York and Paris ; was very intimate with her, and conversed with her upon the subject of remaining in France, and she told her several times that she hoped she would not die

in Europe; she prayed she' might not die there, but wished to go back to her native country.

On cross-examination, she testified that she considered her serious when she stated that.

3. The deposition of Albert C. Haseltine, taken on commission, who testified that he knew decedent from 1870; made her acquaintance in Paris; decedent's party at Le Mans consisted of decedent, Mrs. Tucker, Miss Fanny, now Boulton, and afterwards joined by proponent at Trouville; decedent frequently expressed the desire to return to America; she seemed to be patriotic in an eminent degree, sometimes to an extent tiresome; she did not like French people, detested them and their cookery.

4. The deposition of Edouard Clunet, who testified that he was a counselor of the Court of Appeals in Paris, and acquainted with the Civil Code of France; that, in 1869, the court decided that a foreigner could not acquire a legal domicil in France, without the authorization of the Chief Executive, which opinion has not been changed. He instanced a Bavarian named Forge, who was brought to France at five years of age, served in the French army, married a French woman, established himself at Pau, and resided there until his death, and performed many possible civil and legal acts, practiced his profession, availed himself of electoral rights, and died at seventy-eight years of age. The court decided that he did not acquire a legal domicil, because he obtained no authorization, as required by article 13; that there had been no contrary decision since.

5. The deposition of Julian Field, taken on commission, who testified that he knew decedent, who was his

grandmother; he was proponent's son; he called on Mr. Clark, contestant's son-in-law, after decedent's death, and conversed with him about the appointment of an administrator to her will, the executors having declined; immediately after receiving a letter from Mr. Cisco, dated February 12, 1878, announcing that he declined to act, he called upon Mrs. Clark, by contestant's request, to advise as to what was best to be done; he never attempted to mislead Mr. or Mrs. Clark, touching the nature or contents of the paper; in March, 1878, he wrote contestant at Geneva, requesting her to sign an instrument of waiver, which had been received by his mother from her counsel in New York; at that time contestant knew the nature and contents of the will, as appeared by her letters to proponent, dated March 17 and 28; the idea of making a new will was decedent's own, and the reasons were, first, that, by the death of witness's father, his mother was left destitute; and, second, the marriage of contestant's youngest daughter to a man of means; witness urged decedent to make her intentions known to contestant, but she absolutely refused, alleging that if she did she would be subjected to violence, abuse, worry, and trouble; decedent told witness what she intended doing by her will—what she thought her duty; having once made up her mind, nothing would prevent her from acting in accordance with her decision; on February 24, 1878, he called upon contestant, and showed a letter from Mr. Cisco, dated February 12, 1878, and she referred him to her daughter, Mrs. Clark, and he went to see her, and gave her a letter stating that his object was to consult as to the propriety of asking contestant to agree with his mother as to the appointment of an administrator; no

paper was offered to contestant for her signature at that time ; Mrs. Clark wrote to Mr. Cisco for information as to contestant's will, who replied, giving the information ; at that interview, Mrs. Clark requested that Mr. Cisco should be asked to name a suitable person, for that purpose ; subsequently, in conversation with Mr. Clark, the latter spoke of the intention of his wife to contest the will in her mother's name, and that it had better come to a compromise ; afterwards, he called on Mrs. Clark, and asked the grounds upon which she proposed to contest ; she said, undue influence, but laughed, and said she should never have dreamed of such an absurd and hopeless charge as incapacity, against her grandmother ; he only saw decedent twice, between Mrs. Clark's marriage and decedent's death ; on the first occasion she was clear, strong in intellect, and remarked, after she entered the room, that she could not tell how glad she was that the alteration she made in the will was just and right before Julia's engagement—that she was glad she made it when she was strong and could get about, now that Julia had married a man who could provide for her—that she was not equal to going out very much—the thought that she had not altered the will she made in America would worry her to death—that Eliza had then no one dependent on her, except George, who could take care of himself, if he liked, and she had quite enough money to live quietly and comfortably if she liked ; she often repeated that she was glad that she had altered her will ; the next time he saw her was a week before she died.

On cross-examination, he testified that he was in the habit of visiting decedent two or three times a week,

more or less ; this conversation took place in Mrs. Clark's drawing-room in Paris, where he presented Mr. Cisco's letter, telling her that he had been asked to do so, by her mother, to whom he had submitted it, and asked Mrs. Clark who she thought would be best to suggest as executor ; she said that it had better be left to Mr. Cisco, and they both agreed that proponent and contestant would accept any executor named by him ; Mr. Clark concurred in his wife's suggestion, and said it was necessary for proponent and contestant to waive the rights of administration in order to allow of any one administering the estate, other than the executor named in the will ; Mr. Clark said, " I suppose the will was made in America, was it not ? " witness answered, " I suppose so ; " he sent one of the waivers, sent by counsel to his mother, to contestant ; he had a conversation with decedent about making a new will ; the idea originated with decedent ; she laid the circumstances which induced her to arrive at that conclusion before him, and asked his opinion ; about a year before her death, he told her that he thought she was right ; he never made any suggestion, as to leaving more to his mother than by the will in America, for the purpose of making her income equal to contestant's, so as to make them both equal ; he only concurred with her suggestion ; he knew decedent left a will in America, but not exactly the terms ; and he knew she made a will in Paris, the same evening, or the day after ; he remembered, after decedent's funeral, he and Mr. Clark were collecting some articles left by her, and they came across some of her letters, which he took, and said he would burn ; that there was a mass of papers,

bills, letters, of no interest, and he burned them, two or three days after the funeral

6. A letter from Mr. Cisco, dated February 12, 1878, addressed to the witness, Field, stating that he examined the will, and to his surprise found that he was appointed executor, and that both he and Mr. Stone declined to act; and suggested an agreement between the parties upon an administrator, and that the letter be exhibited to his mother.

7. Two letters from C. Buckingham to decedent, dated in 1868 and 1871, respectively, the former of which contained the following passage, "You speak of your age and infirmities, and your desire to return to the land of your nativity," but he did not see the way clear for her return, and did not know where she could go for lodging, and advised her to remain where she was comfortable and free from irritation.

8. The deposition of Mrs. Julia M. Field, proponent, taken on commission, who testified that decedent was her mother, and contestant her sister; witness and contestant were the only surviving children; decedent lived from 1877 to the time of her death in Paris; left America, where she was born, in 1866; she lived with decedent the latter part of 1871; she lived on the ground floor, while decedent lived on the second, where she was entirely independent of witness; in 1877 she possessed nothing, was dependent on her mother, and had been since her husband's death in January, 1875; her financial condition was known to contestant and decedent; decedent's mind and memory were strong and clear in June and July, 1877; she was perfectly well, and her mental capacity as strong as ever; she was noted for her

clear memory and power of mind, which were marvelous for a woman of her age ; she was well known for her firmness of will and character ; nothing could change her determination, after she had reached a conclusion that she thought right ; witness never attempted to exercise influence over her, never discovered any indication of failing mind or memory ; she was present at the wedding of Miss Tucker, in the early part of January, 1878, about ten days before her death, and appeared quite vigorous in body and mind ; she observed only such emotions as were common to her on such occasions ; she told witness that she was going to execute her will ; witness went with decedent to the American legation, and left her in the private office of Mr. Washburne ; after its execution, witness walked home with her ; she said she was glad the business was done ; she always acted independently ; witness had been on good terms with contestant until this contest began ; she never misrepresented her sister's means ; decedent claimed to be a citizen of the United States and not otherwise, and used to say she was a true-born American ; on July 4, about two years before her death, she said she had a mind to introduce herself as the oldest American lady in Paris, at Mr. Helmbold's, who had invited the Americans in Paris to a free lunch ; she never failed to celebrate Washington's birth-day and the fourth of July, reciting the song of the " Star-Spangled Banner ;" she never declared to the authorities in Paris her intention of residing there ; never procured an authorization, or took any steps to renounce her American citizenship ; repeatedly manifested a desire to return to America, and every winter threatened to return the following spring ; she detested France and the French,

and made them promise that, if she died, they would send her home; about a year and a half before her death she purchased a trunk, and had it marked with her initials and "N. Y.;" witness authorized Julian to communicate with contestant as to the waiver of administration; the paper sent to her was the same as sent to witness; decedent had given more during her life to contestant and her children than to proponent and hers, and the idea of changing her will originated with her, for the reason that witness's husband had died, leaving her penniless; contestant's youngest daughter had married well, and did not need assistance; she consulted friends upon the subject, and requested Mr. Davidge to see her in reference to the matter; when she had decided to make a new will, she requested Mr. Davidge, the lawyer, to come and see her in reference to it, and he did so, and they talked the matter over in decedent's sitting-room; witness learned this from decedent, as she was never present at any of their interviews; but on one occasion contestant's son George came into the room, and decedent asked him some question about his mother's income; he said he didn't know exactly, and asked her what she wanted to know for, and if it was about her new will? She answered it was; decedent told her, after its execution, that she did not communicate its contents to contestant, because she would not be satisfied and would give her no peace.

On cross-examination, she testified that she had been dependent on decedent since her husband's death, and remained so until decedent's death; her husband died in January, 1875, and thereafter decedent began to consider the making of a new will; spoke of it frequently,

and of her desire to equalize witness's income. with that
of contestant; witness wrote to Mr. Cisco and Mr.
Buckingham in the winter of 1876, or summer of 1877,
that, in view of her altered circumstances by the death of
her husband, a new disposition should be made, equaliz-
ing her fortune with contestant's; that she did not know
the terms of the then will, but supposed it in favor of
her sister, as witness's husband was in receipt of a hand-
some income; and she spoke to Miss Stone and Mr.
Hawkes about a new will being made, but did not ask
them to exert influence upon her mother; she had fre-
quent conversations with decedent about her will, but
could not give dates; she approved of her mother's idea,
and deemed it best; she received a visit from Mr. Wash-
burne, in answer to a letter, and her mother executed the
will the next day; decedent referred to a will left with
Mr. Cisco, but she knew nothing of its contents; she did
not write Mr. Cisco, at her mother's dictation, to destroy
that will; she never kept decedent's accounts, but wrote
letters for her from 1875, to the summer of 1877; she
wrote to Mr. Buckingham to find out what contestant's
income was, at decedent's request, and letters were
handed to decedent which contained all the information
which witness had as to her means; she could not specify
the time when decedent expressed an intention to return
to the United States; she never authorized any one to
communicate with decedent with reference to any other
matter connected with the will; decedent first went to
Europe in the thirties and remained about four years,
then returned, and again went to Europe in 1844, remain-
ing a year and a half, and returned; then went to Europe
in 1866, where she died; she traveled from place to place,

always lived in hotels, or *pensions*, wintered at Nice, summered at Baden, and in 1870 and 1871 at Trouville ; since then remained in Paris at No. 4 rue Balzac, for the last eight or nine years ; witness's father died in 1864 ; decedent brought her youngest niece, and her sister followed with her eldest daughter ; witness had been in Europe with her since, and contestant's family lived in Europe ; that witness had two sons in America.

9. Two letters from contestant to proponent, the former stating that she had received a letter from America that decedent had altered her former will, and made a new one, dividing her property unequally, giving the major part to proponent, and that if so she was rejoiced to hear it, as it was right, because her husband had left her without means, etc.; and the latter stating that if decedent had made her will equal, it was her intention to make some allowance to proponent from her estate, but she received a letter from America informing her of the new will, in which almost the whole property was given to her, amounting to about $37,000, leaving witness the paltry sum of $4,500, and refusing to accept it, as unjust, and that she should demand to know the circumstances under which it was made ; and advised her not to oblige her to resort to legal measures, and that the only will she would recognize was that left in America.

10. The deposition of Albert C. Haseltine, taken on commission, who testified that he knew decedent and was in the habit of visiting her in 1877 every week or two ; she was thoroughly American, an enthusiastic admirer of the institutions of the United States, and declared her home to be there ; she detested the French, especially their cooking ; expressed a strong desire to return to

America, and was only prevented by questions of economy, and the impossibility of going at her advanced age, without being accompanied by some member of her family, all of whom preferred remaining ; at one time she expressed a determination to go alone ; he was intimate with her in 1870 at Le Mans ; that in 1870 he found her possessed of mental acuteness, and independence of character, and sterling common sense, the same as he recognized in 1879,—a perfectly sound mind, as he judged from her language and demeanor ; an attempt to influence would have had a contrary result to its design, but she depended on proponent entirely for a quantity of services, necessary for a person of her age ; she spoke of her devotion ; proponent was entirely dependent on her mother, whilst the contestant had means ; and that decedent had gone to the American legation to have her will certified.

On cross-examination, he testified that in September or October, 1870, at Le Mans, she expressed regret that she was not able to return to America.

11. A certificate from the French Minister of Justice that no declaration of intention on the part of decedent, desiring to be domiciled in France, was ever made.

12. Charles A. Jackson, sworn for proponent, testified that he was proponent's counsel, and knew decedent in her life-time ; saw her twice in Paris between July 17 and 25, 1877 ; she appeared robust in health, and surprisingly bright in her ideas and manner of expression ; in her conversation, she expressed herself more intensely American than any woman he had ever met.

On cross-examination, he testified that she spoke of this country as hers, and her desire to return ; said her

absence was caused by her inability to cross the Atlantic, being an aged person, without pain and inconvenience, and because she lived more cheaply abroad ; said it was her desire and intention to return ; that New York was her home—that her friends were there—that she would be buried there ; that she was a person of extremely imperious will.

13. Hickson W. Field, sworn for proponent, testified that he was a son of proponent, and grandson of decedent ; last saw decedent in August, 1872, at 4 rue Balzac, who expressed regret that he was to return so soon, as she would have been glad to have come with him, as she did not wish to die in a foreign land, and that she frequently expressed that wish, and said she thought she should come in the Spring ; that the reason she gave for not coming with him, was that the time was too short for preparation, and to secure a state-room ; that he had received three letters from his grandmother, which were given in evidence ; that decedent left property in this country, consisting of library, paintings, clothing, furniture, and articles of jewelry and silverware stored, though originally left in Twenty-third street ; they were articles she had used in her household ; that he was in Paris about a month.

On cross-examination, he testified as to when the letters given in evidence were received ; that decedent had resided about six years in Paris ; that he conversed with her in the month of August, 1872, as stated on direct ; that he reached Paris in June, went on business, and for his health ; saw decedent every day while he was in Paris in June ; witness's mother was also residing there ; that he was there about a month that time,

then went to Vichy, and remained three weeks, and returned to Paris, from thence to London and Liverpool, and home.

On re-direct examination, he testified that when he came over he engaged his passage back, having a certificate entitling him to a return passage ; the ship was full.

14. Monsell P. Field, sworn for proponent, testified that he was a brother of the last witness, and a grandson of the decedent ; that he occasionally corresponded with his grandmother, during the last years of her life, and received the latest letter in January, 1876 ; saw her last in April, 1865, in America; he was in the United States Navy ; resigned in 1872 ; he had searched for the letters but he could not find any of them ; the subject of her last letter was relative to some of the silver-ware ; he had had one or two letters before, in relation to it, and that she spoke of New York as her home, and he thought she did in every letter she wrote, from 1865 down to that date, express a wish and desire to return, and dread of dying abroad ; the letter contained a list of the articles ; witness carried the letter in his pocket for some time, in the endeavor to find the articles.

On cross-examination, he testified that he showed the letter to his brother shortly after its receipt, and inquired of him as to the articles ; that letter was received in January, 1876, which was the last communication from decedent.

15. In one of the letters by decedent to Hickson Field, of December 20, supposed to be 1869 or 1870, she stated that she would not allow his mother to starve ; that she had given her 2,000 francs, besides paying for

her dinners and little things, not as a loan, but as a gift ; that she was economical for herself, stating the amount she had spent ; that the expenses of board were extra, much higher than before, and that contestant would not pay anything for her part ; that she should do the best she could for her children and grandchildren ; that she felt proud of the boys, and hoped they would make their way in the world.

16. Another, of May 30, 1870, in which she said that she could get more for her money there than at home, but did not wish to die out there ; she might drop off at any time, and that she did not like to leave his mother there alone.

17. Another, of date July 21, 1870, speaking of his removal from his office ; that his grandmother had things stored, among other things, silver articles, such as dishes and covers, two large wine-coolers, which she lent her daughter when she was at Washington ; that she had lent some hundreds of francs ; that she hoped, when she returned, if she found a little house, she should have some of her grandchildren and their mother with her ; she would come home, but feared she would not be able to live in New York, it was so dear.

18. There was also given in evidence a translation from the laws of France, " of the enjoyment and privation of civil rights," enacted March 8, 1803, promulgated the 18th of the same month. The 13th clause or section provides that a foreigner who shall be allowed by authorization of the emperor to establish his domicil in France, shall therein enjoy all civil rights as long as he shall continue to reside there.

Also, the 5th chapter, " of testamentary disposi-

tions," in which, section 967 provides that everybody
may dispose of property by will, whether under the form
of instituting an heir, or under the form of legacy, or any
form appropriate for manifesting his will; section 968
provides that no will can be made in the same document
by two or more persons, whether for the benefit of a third
person, or reciprocal or mutual disposition of their prop-
erty; section 969, that a will may be holographic, or by
public act, or in form mystic; section 973, that the will
must be signed by the testator; and if he cannot sign,
express mention thereof must be stated in the will and
the cause which prevents his signing: section 974, that it
must be signed by the witnesses; section 980, that wit-
nesses called to be present at the execution of wills must
be males of full age, and subjects of the empire, enjoying
civil rights.

Considerable testimony and documentary evidence
was adduced by the parties, in addition to the above, but
the same is sufficiently referred to in the opinion.

JACKSON & MARTINE, *for proponent.*

MILLER & PECKHAM, *for contestant.*

THE SURROGATE.—[After stating the testimony.]—
The questions raised, and necessary for consideration, in
this case, are:

1st. Whether the decedent at her death was domi-
ciled in New York or in France.

2d. Whether the instrument propounded was exe-
cuted by the decedent free from restraint.

The testimony which is claimed by contestant to
establish a domicil in Paris, is substantially the recita-

tion in the will, stating that decedent was late of the State and city of New York, then residing in Paris :— the testimony of Mrs. Tucker, that decedent resided in Paris, and died there :—that of Mrs. Forbes, that decedent had always spoken of remaining in Paris, as her home, never expected to leave, and intended to remain there the rest of her life ; that her exact words were that she never expected to return to America, on account of economy :—that of Mrs. Clark, that, in 1874, when she went to America, decedent told her to tell her friends there she should never see them again, as she would never be able to go to America ; and that at another time she requested her to be sure to have her body sent to America when she died ; that she liked Paris better than any other place ; that her family were all there, and her health was better ; that decedent went to Europe in 1865 or 1866 ; never left Paris, winter or summer, except August, 1870, to June, 1871 ; that she remained in Paris from 1869 to her death in 1878, except her absence in consequence of the war :—that of Henrietta Meilhau, that she conversed with decedent when she went to Le Mans, which must have been about 1870, and said she would like to return to America to see her friends, but was too old, and said that she liked France and French people, and manners, and the climate agreed with her :— that of Mr. May, that he often conversed with decedent, about her former home :—that of Mr. Riggs, that he had often conversed with decedent about investments, and several times she remarked to him, that she never intended to return to this country, because she knew what it cost there, and did not know what it cost here.

The facts and circumstances which are claimed by proponent to establish the continuance of decedent's domicil in New York are that of the witness Mrs. Stone, that decedent spoke of her preference for America, and expressed her intention of returning :—that of Mathilde Flandin, that she had conversed with decedent upon the subject of remaining in France ; she told her several times, she hoped she would not die in Europe, and prayed that she might be able to go to her native country :—that of Mr. Haseltine, that, from 1870 to her death, he knew decedent, and that she frequently expressed a desire to return to America, and did not like the French people :—that of proponent, that decedent claimed to be a citizen of the United States, as late as July 4th, two years before her death ; repeatedly manifested a desire to return to America, and threatened every winter to do so, next spring ; that she detested France, and made them promise to send her remains home ; and that about a year before her death, she purchased a trunk, had it marked with her initials, and " N. Y. ; " but she could not specify the times when decedent expressed her intention to return to the United States ; that she always lived in hotels or boarding-houses, but had remained at 4 rue Balzac since 1871 :—that of Mr. Haseltine, on his second examination, that decedent declared her home to be America, and expressed a strong desire to return, and said she was only prevented from motives of economy, and she could not go at her advanced age, without being accompanied by some member of her family ; and on one occasion she expressed her determination of going there alone ; and when asked on cross-examination to specify dates, he stated only September or October, 1870, at Le

Mans :—that of Mr. Jackson, who testified that he saw decedent in Paris between the 17th. and 25th of July, 1877; that she expressed her desire to return to this country, and that her failure to do so was occasioned by her inability to cross the Atlantic, and she lived more economically abroad; and said it was her desire and intention to return, that New York was her home, that her friends were there, and that she would be buried there :— that of Hickson W. Field, her grandson, that he last saw her in August, 1872, in Paris, when she expressed her regret that he was going so soon; that she would have been glad to have gone with him, as she did not wish to die in a foreign land, and she frequently expressed that wish, and said she thought she should come in the spring :—that of Monsell B. Field, who testified that he received letters from decedent from 1865, in which she spoke of New York as her home, and dread of dying abroad; that he received one letter containing a list of certain articles, belonging to her, in New York, which he received in January, 1876, being the last communication from her, in which she spoke of New York as her home, and her dread of dying in a foreign land :—also a letter to Hickson Field, dated July 31st, 1870, in which she expressed the hope that, when she returned, she would find a little house, and have some of her grandchildren and their mother with her; that she would come home, but was afraid she would not be able to live in New York, it was so dear; which embraces all the testimony directly bearring upon that question, except certain references by Mr. Buckingham in two of his letters to her, referring to her expressed desire to return.

It is true that the witnesses upon this subject are

not very definite in respect to times, when those various expressions of desire or intention were made, and that such expressions, several years before her death, if followed by contrary expressions in her later years, would be consistent with her changed purpose, in respect to the abandonment of her domicil of origin in New York; but there seems to be, in the evidence of Mr. Haseltine and in the letter received by Monsell B. Field, in July, 1876, although the letter could not be produced, strong evidence that she regarded New York as her domicil, and had not intended to establish a domicil in Paris. But another circumstance which I think adds quite materially to that conclusion, is the fact that she went to the American legation and executed the will in strict conformity to the requirements of the statutes of New York; and in a doubtful case, it seems to me that this circumstance is full of significance; that she recognized the fact that her estate was to be administered under that will, according to the laws of the State of New York; otherwise, it must have been known that it was void for any purpose, because not executed in conformity to the laws of France.

I do not regard the recitation in the will, "late of the city and State of New York, in the United States of America, now residing in the city of Paris," as controlling, when taken in connection with the other facts of the case, because the term residing, in common parlance, is used, as signifying a sojourning or present stay.

In Dupuy *v.* Wurtz (53 *N. Y.*, 556), it was held that the execution of a will of personal property depended upon the law of the place where the testator was domiciled at the time of his death, and that for the purpose of succession every person must have a domicil, and but

one, and that the domicil of origin would be presumed to continue until a new one was acquired; and that, to effect a change of domicil, there must not only be change of residence, but the intention to abandon the former domicil, and acquire another as a sole domicil; hence, under the authority of that case, as well as others, it is apparent that the party alleging a change of the domicil of origin holds the burden of proof, and must give satisfactory evidence of a change, and I am of the opinion that the evidence, in this case, is not such as should satisfy the court of an intention to abandon the domicil of origin. But if, according to our law, the expressions of intention indicate a purpose to abandon the domicil of origin, and reside in Paris, with the intention of remaining there permanently, it seems to me an insuperable obstacle to the establishment of a domicil in Paris, found in section 13 of chapter 1 of the Code Napoleon, which reads that a foreigner, who shall have been allowed, by the authority of the emperor, to establish his domicil in France, shall enjoy therein all civil rights, so long as he shall continue to reside there; using the terms "domicil" and "residence," as of different signification; and while I might feel inclined to concur with the learned counsel for the contestant, in his interpretation of the signification of those provisions, unaided by evidence of judicial determination by the courts of France, I am constrained to hold that the testimony of Edouard Clunet, a lawyer of Paris, sufficiently shows that the highest court of France has put a judicial construction upon this section, which holds, substantially, that without such authority the decedent could not become domiciled in France; and if I correctly understand

his testimony, this was in a case much stronger than the present, where the question of the administration of decedent's estate was involved, especially as his testimony is in no way controverted.

I am also confirmed in this opinion by the case of Dupuy v. Wurtz, above cited, for there the learned judge, after an elaborate review of all the decisions of the courts of France upon that subject, reached the same conclusion as to the result of the final adjudication of the court of cassation. I am, therefore, of the opinion that decedent died domiciled in the city of New York, and not in Paris; and that in that respect the will was properly executed, conformably to our law, and valid.

I had occasion to consider a kindred question in Von Hoffman v. Ward (4 *Redf.*, 244).

The next and final question upon which I am called to pass, is whether the evidence warrants the finding that the will in question was executed under restraint, or undue influence, and, bearing upon this question, it is important to understand the mental condition of the decedent at the time of its execution.

It is, perhaps, safe to presume that a lady eighty years of age did not enjoy the same mental vigor that she did in early life, but the preponderance of the testimony, taken in conjunction with the evidence of the subscribing witnesses, in the absence of that of Mr. Washburne, and the attorney who drew the instrument, and who must have known her mental condition, establishes, to my mind, the fact that decedent was of vigorous intellect and clear understanding, and a woman of rather remarkable independent opinions and will.

Without further reference to the testimony upon that

subject, it is sufficient to say that it clearly shows an interested motive on the part of the proponent to procure a change of the former will, which equally divided decedent's estate between proponent and contestant, her daughters, and it is equally clear that her declarations and letters, and the somewhat exuberant advocacy of a change in behalf of his mother by Julian Field, and the conversations between her and decedent upon the subject, indicate the capability on her part to influence decedent in that change. It also appears that she had ample opportunities, being in constant intercourse with her mother, to exercise that influence, but it is proper to say that a very material change in the relative pecuniary condition of the sisters occurred subsequent to the execution of the former will, and that even the contestant recognized that fact, and the propriety of her mother doing so ; also that the various facts and arguments which she urged upon her mother, and endeavored to procure Mr. Cisco and Mr. Buckingham to present to her without success, appear to have been substantially true, and hence it cannot be found from the evidence that any untrue representations were made by her, to her mother, in that regard.

In Deas *v.* Wandell (59 *N. Y.*, 636), it was held that the mere fact that a will gave all decedent's property to persons not related to the testator did not raise the presumption of want of mental capacity or undue influence.

In Seguine *v.* Seguine (3 *Keyes*, 663), it was held that the doctrine of an inofficious document had no place in our law ; that if a testator seems to have had testamentary capacity, when under no undue influence, he may dispose

of his property as he pleases, however absurd such disposition may be.

In Cudney *v.* Cudney (68 *N. Y.*, 148), it was held that, to invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred, and that it was not sufficient to show that the party benefited by a will had the motive and opportunity to exert such influence, but that there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by fraud, or other improper means, that the instrument is not really the will of the testator.  See Booth *v.* Kitchen (3 *Redf.*, 52); Mairs *v.* Freeman (*Id.*, 181) ; La Bau *v.* Vanderbilt (*Id.*, 384).

It appears that decedent and proponent conversed upon the subject of the injustice of the will made and left in New York, in respect to the changed condition of the daughters, and that the decedent recognized and admitted the fact ; and the testimony of Mary Stone, taken in behalf of the contestant, shows that in 1876, in a conversation, she asked witness as to the advisability of changing her will, and stated as a reason that the circumstances of her daughters had altered since her first will, and that she desired to change it, and give proponent more ; observing that contestant had an income and proponent none.

The decedent, in her will, in the residuary clause, which divides the remainder of her property equally between her daughters, states that they are equally dear to her, and any apparent disparity in the amounts provided for them arose from the fact that Mrs. Tucker had

theretofore received from the estate of her late father more largely than Mrs. Field ; and from the fact that Mrs. Tucker was and is possessed of property yielding an income adequate to her maintenance and support, and Mrs. Field would be left destitute, but for the provisions made for her benefit.

The reasons thus stated seem to concur with those expressed to Mrs. Stone, and if they were suggested to her by proponent, they seem to have been reasons which commended themselves to decedent, and there is nothing in this case which shows that the facts stated by proponent and by decedent in her will, were not true.

Redfield, in his *Treatise on Wills*, vol. 1, p. 525, says : " We do not suppose that if the testator is capable of making a valid will, when left to himself, his testamentary act is to be rendered nugatory by the honest importunity of a wife, to obtain only what she deems her fair share of his estate, and which only prevails to that extent; although it could be shown that, without such importunity, the testator would have given her much less. And the same may be said of other relations fairly entitled to the testator's bounty. And although it may be justly said that good faith is no fair criterion of justice and propriety in the measure of the importunity of solicitors for testamentary bounty, yet if the importunity is only to the extent of justice and propriety, its results, to that extent, can scarcely be condemned, because their author would gladly have carried them beyond that limit."

In other words, the considerations addressed to the intelligence and good feeling of a testator, which leave him still to his independent choice, or which influence

his better judgment, cannot be regarded as undue, to the extent of affecting the validity of the testamentary act ; and this seems to be fully sustained by the court of appeals, in Children's Aid Society *v.* Loveridge (70 *N. Y.*, 387). Judge MILLER, at page 394, uses this language : "It (the influence) must not be the prompting of affection ; the desire of gratifying the wishes of another ; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices ; but a coercion produced by importunity, or by a silent, resistless power which a strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear." And in La Bau *v.* Vanderbilt (3 *Redf.*, 384), it was held that influence or importunity which would avoid a will, must be such as to deprive the testator, at the time, of the free exercise of his will, whereby the instrument became the will of another mind, rather than that of the testator, and such undue influence must be proved, and will not be inferred from opportunity and interest,—citing several authorities.

I have not deemed it necessary to consider the extraordinary anxiety in respect to the proposed change of decedent's will manifested by the proponent, or the officious advocacy of its justice by Julian Field, except so far as they seem to bear upon the question of the actual exercise of undue influence upon the decedent, because they are matters of taste and propriety, as to which it is possible, though not probable, that there may be a difference of opinion.

I am, of the opinion that the relations of the parties, and the terms of the will, are not such as to raise any

presumption of undue influence, nor any suspicion which has not been satisfactorily explained by the proponent, and that, therefore, no presumption can be indulged in, against the good faith of the transaction. I am also of the opinion that the testimony, when properly weighed, is not sufficient to justify the conclusion that there was any undue influence exercised by proponent upon the mind of the testatrix, which overcame her independent will in the making of the instrument, and that for those reasons, the paper offered should be admitted to probate, as executed conformably to the laws of this State, by decedent, when she was of sound and disposing mind, free from restraint, and domiciled in this State at her decease.

Decreed accordingly.